PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

EUGENE TYRONE DECASTRO,

　　　　*Petitioner-Appellant,*

v.

GERALD BRANKER, Warden, Central
Prison, Raleigh, North Carolina,

　　　　*Respondent-Appellee.*

No. 10-5

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
James C. Dever III, District Judge.
(5:08-hc-02075-D)

Argued: March 25, 2011

Decided: June 3, 2011

Before TRAXLER, Chief Judge, and WILKINSON and
WYNN, Circuit Judges.

Affirmed by published opinion. Judge Wynn wrote the opinion, in which Chief Judge Traxler and Judge Wilkinson concurred.

## COUNSEL

**ARGUED:** Jonathan Lee Megerian, MEGERIAN & WELLS, Asheboro, North Carolina, for Appellant. Sandra Wallace-

Smith, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Paul M. Green, Durham, North Carolina, for Appellant. Roy Cooper, Attorney General of North Carolina, Raleigh, North Carolina, for Appellee.

## OPINION

WYNN, Circuit Judge:

Petitioner Eugene Tyrone DeCastro seeks habeas relief from his capital sentence for slaying Leon and Margaret Batten. Petitioner argues that he received ineffective assistance of counsel and that the State of North Carolina violated his Eighth Amendment and due process rights by presenting to the jury evidence and argument that contradicted those presented in the trials of his co-defendants. A state court denied Petitioner habeas relief, and the federal district court correctly determined that the state court's decision did not constitute an unreasonable application of clearly established federal law or an unreasonable determination of the facts. Accordingly, we affirm.

I.

In 1993, Petitioner Eugene DeCastro was charged with the murders of Leon and Margaret Batten and robbery with a dangerous weapon of Leon Batten. A Johnston County, North Carolina jury found Petitioner guilty of two counts of first-degree murder and one count of robbery with a dangerous weapon. After a sentencing hearing, the jury recommended a death sentence for each murder conviction. The trial court imposed the recommended death sentences, as well as an additional consecutive sentence of forty years' imprisonment for the robbery conviction. Petitioner appealed to the Supreme Court of North Carolina, which detailed the salient facts in *State v. DeCastro*, 342 N.C. 667, 467 S.E.2d 653 (1996).

At about 5:20 p.m. on February 29, 1992, George Goode, his brother Chris Goode, Glenn Troublefield, and Petitioner went for a ride in George Goode's car. *Id.* at 676, 467 S.E.2d at 657. In Smithfield, North Carolina, they saw a man walking along the road, and George Goode stopped the car. *Id.* Petitioner, George Goode, and Chris Goode got out of the car and assaulted and robbed the man. *Id.* George Goode, Chris Goode, and Petitioner then returned to the car, and George Goode drove away at a high rate of speed. *Id.*

George Goode played "chicken" with other vehicles and eventually lost control of his car and ran into a ditch. *Id.* at 677, 467 S.E.2d at 657. After freeing the car, Petitioner, George Goode, and Chris Goode went to a store and bought a bottle of wine. *Id.* George Goode's reckless driving continued until he lost control of the car again and stranded it near the Dallas Mobile Home Park. *Id.* After unsuccessfully trying to free the car, Petitioner, George Goode, and Chris Goode began walking toward the Dallas Mobile Home Park, where George Goode and his wife rented a mobile home. *Id.* Troublefield, who had asked to be brought home several times, left the area. *Id.*

At about 6:35 p.m., a friend of George Goode's wife saw George Goode and several other men at the Goodes' mobile home. *Id.* Earlier that day, the owner of the Dallas Mobile Home Park, Leon Batten, informed one of the Goodes' neighbors that the Goodes' mobile home was vacant and that he was seeking new tenants. *Id.* The Goodes had apparently been delinquent in paying their rent. *Id.* Between 6:30 p.m. and 7:30 p.m., the neighbor saw a strange man in the mobile home and informed Leon Batten. *Id.* Leon Batten drove his truck to the Goodes' home. *Id.* A few minutes later, witnesses saw several African-American men standing over and beating Leon Batten in the Goodes' yard. *Id.* A park resident drove to the Batten residence and informed Leon Batten's wife, Margaret, of the skirmish, and Margaret Batten drove to the

Goodes' mobile home. *Id.* Other witnesses drove to the home of a deputy sheriff and informed him of the trouble. *Id.*

At about 7:30 p.m., a deputy sheriff arrived at the Goodes' mobile home and saw three African-American men standing in the yard. *Id.* At trial, the deputy identified two of the men as Petitioner and George Goode. *Id.* The men fled, and the deputy was unable to catch them. *Id.* The deputy then discovered the bodies of Leon and Margaret Batten in the cargo bed of Leon Batten's truck. *Id.* They had been stabbed multiple times, and neither had any vital signs. *Id.*

Another deputy sheriff approaching the scene spotted George Goode two-tenths of a mile from the mobile home park. *Id.* George Goode was quickly walking away from the area. *Id.* When taken into custody, George Goode had Leon Batten's wallet. Within an hour after George Goode was taken into custody, Chris Goode approached the crime scene seeking his brother. After noticing bloodstains on Chris Goode's clothing, officers placed him in custody and discovered Leon Batten's partial dental plate in his pocket. *Id.* at 677-78, 467 S.E.2d at 657.

Investigators continued their search. *Id.* Around 6:00 a.m. the next morning, with the aid of a State Bureau of Investigation ("SBI") airplane, officials spotted Petitioner walking along a dirt road in the area. *Id.* at 678, 467 S.E.2d at 657. Officials found Petitioner lying at the base of a tree and arrested him. *Id.*

Investigators later found three sets of human tracks leading from an area near the Goodes' mobile home and were able to follow the tracks despite several gaps. *Id.* The tracks diverged, and one set of tracks ended approximately fifty yards from where Petitioner was arrested. *Id.* at 678, 467 S.E.2d at 657-58.

Investigators found a wine bottle in the passenger compartment of Leon Batten's truck. *Id.* at 678, 467 S.E.2d at 658.

Petitioner's fingerprints matched one of two fingerprint lifts taken from the bottle. *Id.* Further, the inside of the truck tailgate was smeared with a blood-like substance that had a handprint in it. *Id.* That handprint matched Petitioner's. *Id.* And blood taken from the camouflage jacket Petitioner was wearing when arrested matched Leon Batten's. *Id.*

An SBI agent and a sheriff's detective testified regarding a statement Petitioner made while they were collecting his clothing at the jail. *Id.* The officers took Petitioner's clothes and told him to remove everything from his pockets and place it on a nearby bench. *Id.* Petitioner removed $13.00 from his pockets, and the detective asked the agent "if it was okay for [Petitioner] to keep the money." *Id.* The agent then turned toward Petitioner and saw some money in Petitioner's top pocket. *Id.* Before the agent could say anything, Petitioner said, "I had some of my own money, too, now." *Id.*

The medical examiner who conducted the autopsies on Leon and Margaret Batten also testified. *Id.* She described the eight stab wounds to Margaret Batten's head and neck, the fifteen stab wounds to her chest and abdomen, and the numerous defensive wounds on the backs of her hands. *Id.* The medical examiner testified that Margaret Batten's death was neither quick nor painless; rather, she was likely to have remained conscious for the five to ten minutes it took her to die. *Id.* at 679, 467 S.E.2d at 658. As for Leon Batten, the medical examiner described several stab and puncture wounds on his body, internal injuries, blunt trauma to his head and face, and the stab wound to the heart that ultimately killed him. *Id.*

Petitioner did not testify or offer any evidence during the guilt phase of the trial. *Id.* The jury found him guilty of murdering Leon and Margaret Batten as well as robbing Leon Batten. *Id.* at 676, 467 S.E.2d at 656.

During the sentencing phase of Petitioner's trial, the State offered testimony from the medical examiner regarding the

painful nature of the victims' deaths. *Id.* at 679, 467 S.E.2d at 658. The State also introduced evidence that when Petitioner was seventeen, he was convicted of voluntary manslaughter and common law robbery and received a six-year sentence for those offenses. *Id.*

In response, Petitioner offered the testimony of several witnesses during the sentencing proceeding. A police detective testified about the circumstances of Petitioner's prior conviction for voluntary manslaughter. *Id.* The detective testified that Petitioner had been at a birthday party when one of his friends got into a fight. *Id.* Petitioner handed his friend a knife, and the friend stabbed the other person and ran. *Id.* The detective testified that Petitioner did not stab anyone and was very cooperative during the investigation of the crime. *Id.* Prison and jail officials also testified that Petitioner was well-behaved and cooperative while awaiting trial in this case. *Id.*

Petitioner's mother and aunt testified about his childhood and family life. *Id.* They spoke about the separation of Petitioner's parents but gave an impression of a relatively normal childhood and loving family that would suffer if Petitioner were executed. They also testified that Petitioner had been regularly employed at the time of the murders and robbery. *Id.* at 680, 467 S.E.2d at 659. Petitioner then addressed the jury, stating that he was very sorry about the Battens' deaths. *Id.* Nevertheless, the jury returned recommendations for death on both murder counts. *Id.* at 676, 467 S.E.2d at 656.

Petitioner appealed his sentence to the Supreme Court of North Carolina. That court rejected Petitioner's argument that a knife found in a local pond[1] was improperly admitted to evidence on relevance grounds. *Id.* at 680, 467 S.E.2d at 659. Likewise, the Supreme Court of North Carolina disagreed

---

[1]"The knife in question was found on 5 June 1992 by a boy while fishing in a pond some distance away from the crime scene." *Id.* at 681, 467 S.E.2d at 659.

with Petitioner's contention that he was deprived of a fair trial when the prosecutor argued that no physical evidence connected key witness Troublefield to the crime scene. *Id.* at 682, 467 S.E.2d at 660. The Supreme Court of North Carolina further rejected Petitioner's argument that the statement he made while in police custody—"I had some of my own money, too, now"—was improperly admitted despite Petitioner's having requested counsel prior to making the statement. *Id.* at 683-84, 467 S.E.2d at 661-62. Petitioner also unsuccessfully urged that the trial court erred in admitting Troublefield's testimony that he was afraid of Petitioner. *Id.* at 685, 467 S.E.2d at 662.

Additionally, Petitioner unsuccessfully argued that the trial court made various errors in instructing the jury. *Id.* at 686-700, 467 S.E.2d at 662-71. Petitioner also contended that the trial court improperly allowed potential jurors with reservations about the death penalty to be struck and improperly refused to impanel a new jury for sentencing—but the court had rejected both of those arguments in prior cases. *Id.* at 699-700, 467 S.E.2d at 670-71 (citing, inter alia, *State v. Jones*, 336 N.C. 229, 443 S.E.2d 48 (1994), and *State v. Gladden*, 315 N.C. 398, 340 S.E.2d 673 (1986)).

The Supreme Court of North Carolina further rejected arguments regarding the aggravating circumstances submitted to the jury and the constitutionality of the death penalty generally. *Id.* at 693-701, 467 S.E.2d at 666-71. Finally, the Supreme Court of North Carolina determined that the evidence supported the aggravating circumstances that the jury had found, that no arbitrary factor influenced the jury's imposition of the death penalty, and that the death penalty was, in this case, neither excessive nor disproportionate. *Id.* at 701-04, 467 S.E.2d at 671-73. Petitioner sought further review by the Supreme Court of the United States, but it denied certiorari. *DeCastro v. North Carolina*, 519 U.S. 896 (1996).

Petitioner then pursued habeas relief, through a Motion for Appropriate Relief ("Motion") filed in state court in North

Carolina. Petitioner made various allegations, including that mutually incompatible theories of motive, level of participation, and relative culpability at Petitioner's and his co-defendants' trials denied him due process, equal protection, and the right to be free from unusual punishment. Petitioner also contended that his counsel was ineffective in, among other things, failing to investigate, prepare, and present mitigating evidence. On February 2, 2005, the state court granted Petitioner an evidentiary hearing on one of his claims but denied him an evidentiary hearing as to the rest, which the court dismissed in a 106-page order. In March 2005, Petitioner amended his Motion, adding claims regarding forensic blood evidence and ineffectiveness of appellate counsel. The state court held an evidentiary hearing on March 20 through March 22, 2006 but ultimately denied all three remaining claims.

Petitioner sought further review by the Supreme Court of North Carolina, but that court denied his petition for a writ of certiorari. Petitioner then turned to the federal courts and filed his habeas corpus petition in federal district court on May 22, 2008. Petitioner made multiple arguments as to how he received ineffective assistance of counsel at trial and sentencing and on appeal. Petitioner then contended that the State improperly failed to disclose exculpatory evidence at trial and sentencing. Petitioner also maintained that his Eighth Amendment and due process rights were violated when the State presented evidence and argument contradicted by those presented in the trials of Petitioner's co-defendants George and Chris Goode. Finally, Petitioner argued that the trial court erred in its jury instructions. Petitioner asked the district court to vacate his convictions or death sentences. On cross-motions for summary judgment, the district court granted summary judgment in favor of Respondent Gerald Branker, Warden of Central Prison in Raleigh, North Carolina, denied Petitioner's motion for summary judgment, and dismissed the petition for writ of habeas corpus. Petitioner moved to amend the order and judgment denying him a writ of habeas corpus;

this, too, the district court denied. On July 13, 2010, Petitioner appealed to this Court.

## II.

While we review the district court's denial of habeas relief de novo, *Lewis v. Wheeler*, 609 F.3d 291, 300 (4th Cir. 2010), we generally view this appeal through the highly deferential lens mandated by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d). As the Supreme Court recently underscored in its unanimous opinion in *Harrington v. Richter*, 131 S. Ct. 770 (2011), AEDPA deference helps to ensure "confidence in the writ and the law it vindicates." *Id.* at 780. We may grant habeas relief on claims adjudicated on their merits in state court only if that

> adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Cummings v. Polk*, 475 F.3d 230, 237 (4th Cir. 2007) (internal quotation marks omitted).

"A state court's decision is contrary to clearly established federal law 'if the state court arrives at a conclusion opposite to that reached by th[e Supreme] Court on a question of law' or 'confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at'" an opposite result. *Lewis*, 609 F.3d at 300 (alteration in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). Further, a state court unreasonably applies federal law when it "'identifies the correct governing legal rule from th[e] Court's cases but unreasonably applies it to the facts of the particular . . . case,'" or "'unreasonably extends a legal principle from

[the Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" *Id.* at 300-01 (alteration in original) (quoting *Williams*, 529 U.S. at 407). Stated differently, to obtain federal habeas relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 131 S. Ct. at 786-87.

### III.

Most of Petitioner's arguments revolve around whether his counsel was effective. We therefore begin with a brief overview of the "high bar" that Petitioner attempts to surmount. *Id.* at 788 (internal quotations omitted).

To demonstrate ineffective assistance of counsel, Petitioner must show "that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). Regarding the first prong, a "deficient" performance is one that falls "below an objective standard of reasonableness." *Id.* at 511. Petitioner must show "that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the Sixth Amendment." *Harrington*, 131 S. Ct. at 787 (internal quotation marks omitted). *See also Strickland v. Washington*, 466 U.S. 668, 687 (1984) ("First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.").

Our deferential assessment of counsel's performance must "include[ ] a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time . . . ." *Wiggins*, 539 U.S. at 523 (internal quotation marks

omitted). Further, we must resist the temptation to "second-guess counsel's assistance after conviction or adverse sentence" and make "every effort . . . to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Indeed, we must review with "scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve." *Harrington*, 131 S. Ct. at 788 (internal quotation marks omitted).

Regarding the second prong—that is, whether counsel's deficiency prejudiced the defense—"the prejudice inquiry centers on 'whether there is a reasonable probability that, absent [counsel's] errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Williams v. Ozmint*, 494 F.3d 478, 484 (4th Cir. 2007) (quoting *Strickland*, 466 U.S. at 695). *See also Strickland*, 466 U.S. at 687 ("Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."). Such a showing "requires a substantial, not just conceivable, likelihood of a different result." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011) (internal quotations omitted). In making this determination we review the "totality of the evidence before the . . . jury." *Ozmint*, 494 F.3d at 484 (internal quotation marks omitted).

A.

Petitioner first argues that his counsel's attempt to suggest that he was not present at the crime scene, instead of conceding Petitioner's presence but arguing that he played a lesser role, was ineffective. The state court concluded that Petitioner failed to satisfy either *Strickland* prong, noting that, in addition to arguing that the State failed to show beyond a reasonable doubt that Petitioner was at the scene, the defense also argued that it was more likely that George and Chris Goode committed the crimes. The federal district court agreed and

further stated that Petitioner "fail[ed] to present any information to rebut the [state] court's finding that counsel's decision was trial strategy that counsel selected after reasonable investigation and consideration." [J.A. 311] We agree.

In *Harrington*, the Supreme Court emphasized that

> [t]here are . . . countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. Rare are the situations in which the wide latitude counsel must have in making tactical decisions will be limited to any one technique or approach. . . . Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies.

131 S. Ct. at 788-89 (internal quotation marks and citation omitted). If the chosen defense strategy is unsuccessful, "even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better . . . ." *Id.* at 790. But which strategy might have been best is not the pertinent inquiry; instead, we ask whether the strategy counsel chose was objectively reasonable. *Id.*

Here, defense counsel chose a strategy of casting reasonable doubt as to whether Petitioner was present at the scene of the crime. Counsel pursued this strategy after consulting with attorneys from the Death Penalty Resource Center as well as with Petitioner and after investigating the case. While other advocates may not have chosen the same strategy, that does not make its employment a Sixth Amendment violation. We recognize that the chosen strategy had weaknesses, particularly in light of evidence such as the blood found on Petitioner's clothing and the handprint found at the crime scene. Nevertheless, the state court supportably determined that the chosen strategy was objectively reasonable, in light of facts

such as Petitioner's being found relatively far from the crime scene (as opposed to George Goode, for example, who was found close by); the State's acting-in-concert theory (which would make anyone involved, even if to a lesser extent, culpable); and witness testimony indicating that everyone present at the crime scene participated in the attack on the Battens.

Further, defense counsel did argue that the real culprit was George Goode. During closing argument, for example, defense counsel stated:

> Now getting to who had the motive to do this? Who did have the motive? The people who walked up with the teeth and the people who walked up with the pocketbook of Mr. Batten. That's who had the motive. The tenant who was trying to beat Mr. Batten out of his rent, who had every reason in the world to start a problem with him, Mr. George Goode. . . . He was acting crazy. His brother was going right along with him. They were there and they—they're the ones who had the motive to do this.

[J.A. 3168-69] The state court, in ruling on Petitioner's Motion, therefore noted that, in addition to arguing that the State had failed to prove beyond a reasonable doubt that Petitioner was present when the crimes were committed, defense counsel had argued that the Goodes were the primary perpetrators. The state court was not unreasonable in holding that defense counsel's strategy was not constitutionally ineffective. The district court therefore correctly held that the strategy cannot serve as the basis for federal habeas relief.

B.

Petitioner next argues that he received ineffective assistance because his counsel failed to investigate and present evidence that co-defendant George Goode had confessed to a

fellow prisoner, Patrick Byrd. Petitioner argues that Byrd's testimony would have shown that George Goode was primarily responsible for the murders.

Byrd's statement indicated that Petitioner, George Goode, and Chris Goode were in George Goode's trailer when Leon Batten came to ask for the rent money. Per Byrd's account of George Goode's account, George Goode argued with Leon Batten; Petitioner then initiated the attack on Leon Batten by hitting him. When Margaret Batten arrived, both Goodes and Petitioner attacked her. Byrd indicated that both Goodes and Petitioner moved the bodies into Leon Batten's truck bed and passed around Leon Batten's false teeth.

Defense counsel discussed Byrd's statement with Petitioner but did not interview Byrd. Defense counsel's notes indicate that Petitioner told counsel that Byrd's statement was "inaccurate." [J.A. 1533A] Petitioner instructed his attorneys not to use Byrd's statement or to call Byrd as a witness. Indeed, Byrd's statement would not only place Petitioner at the crime scene as an active participant in the attack on the Battens—it would establish that Petitioner was the first assailant to strike Leon Batten, that he actively participated in the attack on Margaret Batten, and that he engaged in gruesome behavior such as passing around Leon Batten's dental plate.

Defense counsel's decision not to call Byrd as a witness was not ineffective. Nor was his failure to interview Byrd—the substance of whose testimony counsel already knew. *See Huffington v. Nuth*, 140 F.3d 572, 580 (4th Cir. 1998) ("The Sixth Amendment . . . does not always compel counsel to undertake interviews and meetings with potential witnesses where counsel is familiar with the substance of their testimony."). The state court was, accordingly, not unreasonable in holding that defense counsel was not constitutionally ineffective on this issue, and it thus cannot serve as the basis for federal habeas relief.

## C.

Petitioner contends that defense counsel failed to effectively present evidence showing that George Goode had a motive to kill because he suspected his wife had cheated on him, allegedly with Leon Batten. As an initial matter, we note that defense counsel did argue to the jury that the Goodes, and not Petitioner, had the motive to kill the Battens. Petitioner, however, focuses on letters that George Goode wrote to his wife—and particularly a letter dated February 25, 1992, four days before the murders. That letter, which was not admitted into evidence, states:

> I really need to talk to you because I don't want us to part this way. *Please* let me know what happened. As you might already know some people told me that you had cheated on me while I was away. At first I was ready to just kill someone anyone but as the days went by I had a chance to think and all I want to know is [whether] what they said was true. . . . If you really love me like I thought you did you will be at your mothers house Friday afternoon about 6 pm. We really need to talk. Just me and you.

[J.A. 696-97] Petitioner argues that the letter evidenced George Goode's motive and murderous intent and shows that George Goode was the leader of the crimes against the Battens.

To begin, Petitioner's argument overlooks the second half of the February 25, 1992 letter, indicating that George Goode's murderous thoughts had dissipated. Further, George Goode never indicated in the February 25 letter—or any other letter in the record—that Petitioner was not involved in the Batten murders as alleged or that George Goode himself was planning to attack Leon Batten. As the state court noted, even if introduced into evidence, the letter "would not necessarily show that George Goode had acted on his anger, or that

DeCastro was not otherwise involved as alleged." [J.A. 1987] The state court therefore concluded that the letter's not being introduced was neither unreasonable nor prejudicial.

Petitioner points to the fact that the State used the letters to show the jury in George Goode's trial that George Goode was the ringleader with a motive. As the district court accurately noted, however, "simply because the State chose to use the letter at George Goode's trial does not establish a reasonable probability of a different result had the letter been introduced at DeCastro's sentencing." [J.A. 319] We agree with the district court that "[u]ltimately, given the limited significance of George Goode's letters and considering the evidence presented against DeCastro at his trial, the [state court ruling on the Motion] did not act unreasonably in finding no prejudice under *Strickland* and its progeny." *Id.*

D.

Petitioner argues that his counsel was ineffective by failing to rebut evidence that a knife found in a local pond was a missing murder weapon and argument that only Petitioner could possibly have thrown it into the pond. The record reveals, however, that defense counsel did throw into question whether the knife found in the pond was, in fact, the murder weapon. Indeed, the State's pathologist conceded on cross-examination that there was nothing special about the pond knife and that any knife of that size could have caused the Battens' wounds.

Petitioner nevertheless maintains that later-adduced evidence showed that the pond knife did not fit in the knife stand inside George Goode's home. In contrast, other knives obtained from a knife company after Petitioner's conviction were more consistent with the Battens' wounds than the pond knife and did fit in the knife stand but were not recovered from the crime scene.

As the state court indicated, whether the pond knife fit inside the Goodes' knife stand is not particularly relevant; the knife could have come from the Goodes' home—regardless of whether it was in a stand, on a counter-top, or in a drawer. Moreover, the State's pathologist conceded that the pond knife was not necessarily a murder weapon and that any knife of similar size could have been used. Under these circumstances, we agree with the district court that the state court was not unreasonable in dismissing this claim, nor was there any reasonable probability, in light of the substantial evidence against Petitioner, that the jury would have reached a different verdict had it received further information about the pond knife, knife stand, and other later-obtained knives.

E.

Petitioner contends that defense counsel was ineffective for failing to investigate and introduce into evidence George Goode's conduct history as a Marine, and specifically his prior assault of a fellow Marine with a Gerber knife, the same type of knife as the smaller of the knives used in the Batten murders. Petitioner maintains that such evidence would have led the jury to conclude that Petitioner was a lesser participant.

In response to this argument, the state court determined that "[a]ny evidence elicited at trial by DeCastro about the earlier knife assault by George Goode would have created, at best, a speculative inference that George Goode and not DeCastro was involved in the killing of the Battens—an inference that does not 'point directly' to the guilt of George Goode." [J.A. 2083] Further, the state court noted that the evidence at issue would "not prove that George Goode's knife was not used by DeCastro, or that some other knife was not used by DeCastro . . . ." [J.A. 2084] In other words, the fact that George Goode owned the Gerber knife and had previously used it against someone would not negate the State's case that DeCastro acted in concert with others to murder the Battens with two

knives. The state court therefore concluded that Petitioner failed to show prejudice under *Strickland*.

On appeal, as before the district court, Petitioner has failed to show that the state court's determination of this issue was unreasonable. Indeed, Petitioner has failed to explain how this argument could prevail in the face of the State's concession that the Gerber knife was found in a location indicating that George Goode dropped it after the attack on the Battens. Further, the State did not argue that Petitioner wielded the Gerber knife—but did argue that "he who runs with the pack is responsible for the kill." [J.A. 3171] Under these circumstances, the state court's determination was not unreasonable, and the district court did not err in refusing habeas relief on this ground.

### F.

Petitioner next argues that defense counsel failed to adequately respond to the State's evidence of the robbery. Under North Carolina's statutory provision pursuant to which a jury selects life imprisonment or death, aggravating circumstances that may be considered are limited to certain categories. N.C. Gen. Stat. § 15A-2000(e). Those categories include whether "[t]he defendant had been previously convicted of a felony involving the use or threat of violence to the person . . . ." N.C. Gen. Stat. § 15A-2000(e)(3). To support the aggravating circumstance that Petitioner had a prior conviction for a felony involving the threat or use of violence, the State introduced evidence that Petitioner had previously been convicted of manslaughter and common law robbery. Petitioner maintains that the facts of the robbery are not as aggravating as the conviction suggests and that it was prejudicial not to present those facts to the jury.

In support of this argument, Petitioner asserts that he was seventeen when he committed the common law robbery, and that he was with four nineteen-year-olds when one of the oth-

ers suggested that they rob a pizza deliverer. Petitioner asserts that he simply went along with the plan but did not possess the weapon and did not personally threaten the victim.

Petitioner fails to mention that other circumstances of the robbery could well have damaged his case, had the jury learned of them. Specifically, Petitioner and several other young men ganged up on a pizza delivery boy and robbed him using a butcher's knife. In other words, Petitioner's robbery conviction shared similarities with the crimes against the Battens—it involved a large knife, multiple perpetrators ganging up on a victim, and theft.

The record reveals that defense counsel knew details of Petitioner's prior robbery conviction as well as his other convictions, discussed the prior convictions with Petitioner, and obtained materials such as records and guilty plea transcripts. Indeed, in the case of Petitioner's prior manslaughter conviction, the circumstances of which were indeed more mitigating than the conviction itself would convey, defense counsel ensured that the jury learned of helpful details. Defense counsel put a detective who had investigated the manslaughter conviction on the witness stand. The detective testified that Petitioner, then seventeen, handed a knife to a friend, who in turn used the knife to defend himself against other youths who had attacked him at a party.

On this record, Petitioner has failed to "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotation marks omitted). Further, Petitioner has failed to show prejudice such that there exists a "substantial, not just conceivable, likelihood of a different result." *Cullen*, 131 S. Ct. at 1403 (internal quotations omitted). As the district court noted, "[u]nlike in *Rompilla* [*v. Beard*, 545 U.S. 374 (2005),] where counsel failed to investigate [a] rape conviction, DeCastro's counsel investigated the common law robbery conviction. Moreover, evidence of

DeCastro's role in the common law robbery is not the type of substantial and persuasive mitigating evidence that counsel failed to discover in *Rompilla*." [J.A. 335] Accordingly, the state court did not act unreasonably in denying habeas relief on this basis, nor did the district court err in denying relief.

G.

Petitioner next contends that he received ineffective assistance of counsel because his attorneys failed to investigate and present mitigating evidence at sentencing. Specifically, Petitioner argues that the evidence that was presented inaccurately portrayed a happy childhood when, in reality, Petitioner's father was an alcoholic and drug user who gave Petitioner and his brother drugs at an early age; Petitioner's mother had a criminal history; and Petitioner was in the borderline range of normal intellectual functioning.

The state court determined that, contrary to Petitioner's assertions, defense counsel worked diligently to develop reasonable trial and sentencing strategies based upon thorough investigation. While the state court's evaluation may be somewhat overly optimistic, this case differs from those cited by Petitioner, in which counsel's scant investigation and presentation of mitigation evidence failed to pass constitutional muster. For example, in *Gray v. Branker*, 529 F.3d 220, 229-31 (4th Cir. 2008), despite repeated indications of the defendant's mental impairment, defense counsel did not investigate the defendant's mental health after the defendant instructed counsel not to do so. This Court held, among other things, that a reasonable lawyer would not rely on such a defendant's self-assessment and instruction not to investigate his mental health. *Id.* at 231.

Similarly, in *Wiggins*, 539 U.S. 510, the only significant mitigating factor the defendant's capital jury heard was that the defendant had no prior convictions. While defense counsel had indications that the defendant's childhood had been mis-

erable, defense counsel conducted only a minimal investiga-
tion and failed to discover that the defendant experienced
severe, long-term physical and sexual abuse and torment
throughout his childhood, including repeated rape while in
foster care. *Id.* at 535. The Supreme Court held that such com-
pelling mitigating evidence might well have produced a dif-
ferent outcome and that counsel's scant efforts were
prejudicially deficient. *Id.* at 536.

Here, counsel investigated Petitioner's personal back-
ground and presented related mitigating evidence during the
sentencing phase of Petitioner's trial. Counsel investigated
Petitioner's personal history, speaking with Petitioner, his
mother, and his aunt. Further, counsel retained an investiga-
tor, who obtained information about Petitioner, including
school and criminal records. Additionally, counsel had a psy-
chiatric expert with extensive capital experience—Dr. Claudia
Coleman—evaluate Petitioner. Dr. Coleman found Petitioner
to be mentally stable, with no indication of any mental health
illness or psychological factors that might be helpful in the
defense. Dr. Coleman stated: "I can find no psychological fac-
tors which might be helpful in your defense of this case."
[J.A. 1572]

In his post-conviction case, Petitioner re-approached Dr.
Coleman, who submitted an affidavit underscoring that her
work was for guilt-only issues and that her time spent on the
case would have been inadequate to assess potential psychiat-
ric mitigation evidence. Dr. Coleman further indicated that,
upon a more detailed post-conviction review, she found
potential mitigation areas, including, for example, Petitioner's
exposure to "poor parental role modeling," Petitioner's long
history of drug and alcohol abuse, and Petitioner's suffering
from a learning disability in childhood. [J.A. 961] These
potential mitigating factors are, however, not on a par with the
substantial mitigation evidence missed by counsel in *Gray*
and *Wiggins*.

Further, Petitioner apparently relayed information about at least some of these mitigation factors only after his conviction and sentence. Petitioner conceded that he "obviously did not understand that these very private facts about [his] family and personal background could be presented in his favor at the sentencing hearing, even though they involved illegal conduct and would be otherwise embarrassing." [J.A. 601] Regardless, the state court did not act unreasonably in refusing Petitioner's attempt to upend his conviction and sentence based on the information that he failed to timely provide to counsel.

Finally, we note that defense counsel presented not insubstantial mitigating evidence on Petitioner's behalf. Specifically, defense counsel pursued a strategy of depicting Petitioner's family life in a positive light, emphasizing his loving parents and aunt, who would suffer greatly if Petitioner were executed. As a result, the jury found Petitioner's loving relationship with his mother to be a mitigating circumstance. Defense counsel also presented evidence through two witnesses that Petitioner was a well-behaved, obedient prisoner. And defense counsel put on evidence regarding the mitigating circumstances of Petitioner's prior manslaughter conviction. The state court was not unreasonable in refusing to grant relief on this basis. The district court therefore correctly denied federal habeas relief.

IV.

With his last argument,[2] Petitioner contends that the State

---

[2]While not identified as a distinct "argument," Petitioner emphasized in his briefing and oral argument that the state court, in ruling on Petitioner's Motion, allowed the State to draft its order. Petitioner attempts to cast a shadow over the order by noting that it "originated from the word processor of Respondent's counsel and consists mainly of the State's MAR Answer . . . ." Reply Brief at 1. In *Harrington*, however, the Supreme Court made clear that a state court need not even issue an opinion explaining its denial of habeas relief. *Harrington*, 131 S. Ct. at 785 ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"). We therefore decline Petitioner's invitation to look behind the state court order to consider how it was drafted.

violated his due process and Eighth Amendment rights by presenting at his trial evidence and argument that contradicted evidence and argument later used at the trials of George and Chris Goode. According to Petitioner, the State persuaded the jury to sentence him to death by arguing that he was the ringleader who murdered the victims but then made the same claims about George Goode at his trial. Meanwhile, Petitioner contends that at Chris Goode's trial, the State conceded that it could not prove which defendant actually stabbed the Battens.

A habeas petitioner's conviction must be reviewed with an eye toward the "law prevailing at the time [his] conviction became final . . . ." *Teague v. Lane*, 489 U.S. 288, 306 (1989) (internal quotation marks omitted). Indeed, a habeas petitioner, with only narrow exceptions, may not benefit from either 1) a new Supreme Court rule decided after his conviction became final, or 2) a novel expansion of a rule established by preexisting precedent. *Stringer v. Black*, 503 U.S. 222, 227-28 (1992). As the Supreme Court stated, "[t]he interests in finality, predictability and comity underlying our new rule jurisprudence may be undermined [either] . . . by the invocation of a rule that was not dictated by precedent . . . [or by] the application of an old rule in a manner that was not dictated by precedent." *Id.* at 228.

At issue here is the Supreme Court's ruling in *Bradshaw v. Stumpf*, 545 U.S. 175 (2005). In that case, the Sixth Circuit had held that a prosecutor's use of inconsistent, irreconcilable theories (involving two separately prosecuted defendants, where the prosecution claimed in each case that the defendant was the shooter) violated due process, invalidating the defendant's plea. *See Stumpf v. Mitchell*, 367 F.3d 594 (2004).

On appeal, the Supreme Court held that the prosecutors' pursuit of irreconcilably inconsistent theories in the petitioner's and his co-defendant's cases did not void the petitioner's guilty plea, where Ohio law did not distinguish between a

principal actor and an aider and abettor and where the change in the prosecution's theory occurred after the defendant's guilty plea. But the Supreme Court also indicated that the inconsistent, irreconcilable theories may have prejudiced the petitioner at his capital sentencing, where the sentencing panel concluded that the petitioner was the shooter. *Id.* at 187-88. The Supreme Court stated:

> The prosecutor's use of allegedly inconsistent theories may have a more direct effect on Stumpf's sentence, however, for it is at least arguable that the sentencing panel's conclusion about Stumpf's principal role in the offense was material to its sentencing determination. The opinion below leaves some ambiguity as to the overlap between how the lower court resolved Stumpf's due process challenge to his conviction, and how it resolved Stumpf's challenge to his sentence. . . . In these circumstances, it would be premature for this Court to resolve the merits of Stumpf's sentencing claim . . . . Accordingly, we vacate the portion of the judgment below relating to Stumpf's prosecutorial inconsistency claim, and we remand the case for further proceedings . . . .

*Id.*

Before *Bradshaw*, the Supreme Court had not suggested that inconsistent prosecutorial theories could constitute a due process violation. *Id.* at 190 (Thomas, J., concurring) ("This Court has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories."). This court mentioned, in dictum, in *United States v. Higgs*, 353 F.3d 281, 326 (4th Cir. 2003), that "due process may be violated if 'an inconsistency . . . exist[s] at the core of the prosecutor's cases against the defendants for the same crime,' *see Smith v. Groose*, 205 F.3d 1045, 1052 (8th Cir. 2000) (finding due process violation where prosecution obtained two convictions for the same murder based on

conflicting statements from the same cooperating codefendant) . . . ." But this Court's dictum is not binding, and in any event *Higgs*, as well as *Groose*, post-date the finality of Petitioner's state proceedings here, rendering them irrelevant.[3]

State convictions are final under *Teague* "when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied." *Beard v. Banks*, 542 U.S. 406, 411 (2004). Petitioner's conviction became final on October 7, 1996. *DeCastro*, 519 U.S. at 896. Because *Bradshaw* (and *Higgs* and *Groose*) post-dated the finality of Petitioner's conviction, they cannot help him in his quest for habeas relief.

To avert this outcome, Petitioner does not argue that his case fits into a *Teague* exception.[4] Instead, he argues cases establishing that a state cannot present false evidence and cannot, for example, present testimony that it knows is false. *See, e.g., Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Mooney v. Holohan*, 294 U.S. 103, 112 (1935). Petitioner then suggests that the State acted deceptively. But Petitioner's contentions revolve around inconsistent arguments and theories, not false evidence.

The state court rejected this claim, and the district court determined that the state court, in so doing, did not act unrea-

---

[3]Petitioner also cites a concurring opinion out of the Eleventh Circuit (*Drake v. Kemp*, 762 F.2d 1449 (11th Cir. 1985) (en banc) (Clark, J. concurring)), and a vacated opinion out of the Ninth Circuit (*Thompson v. Calderon*, 120 F.3d 1045 (9th Cir. 1998), *vacated*, 523 U.S. 538 (1998)). These opinions, too, carry no precedential weight.

[4]The first *Teague* exception is for rulings that place "certain kinds of primary, private individual conduct beyond the power of the criminal lawmaking authority to proscribe." *Teague*, 489 U.S. at 307, 311 (internal quotation marks omitted). The second is for "watershed" rulings implicating fundamental fairness, i.e., "implicit in the concept of ordered liberty." *Id.* Neither exception is applicable here.

sonably. As the district court noted, "because *Bradshaw* did create a new rule, *Teague* bars DeCastro's claim. Alternatively, even if *Bradshaw* did not create a new rule, DeCastro has failed to show the [state court's] ruling is contrary to, or based on an unreasonable application of, clearly established federal law." [J.A. 357-58] We agree and likewise deny Petitioner habeas relief on this basis.

## V.

Petitioner has failed to show that the state court that denied him habeas relief unreasonably applied clearly established federal law or unreasonably determined the facts. Accordingly, we affirm the district court's denial of habeas relief.

*AFFIRMED*