Affirmed by published opinion. Judge WYNN wrote the opinion, in which Judge MOTZ joined. Senior Judge DAVIS wrote a separate opinion concurring in part and dissenting in part.
WYNN, Circuit Judge:
In 2006, a jury convicted Ivan Teleguz of capital murder for hire of his ex-girlfriend. After making his way through the Virginia state courts, Teleguz sought habe-as corpus relief in federal court. In 2012, this Court held that the district court had failed to engage in a sufficient inquiry into Teleguz’s habeas petition, particularly as it related to his gateway innocence claim. Accordingly, we remanded for reconsideration.
Before us now is the fruit of that remand. After a several-day evidentiary hearing, the district court made determinations using the' appropriate legal standard and supported by the record. The district court’s denial of Teleguz’s petition for a writ of habeas corpus therefore stands.
I.
In 2001, Stephanie Sipe was found murdered in the Harrisonburg, Virginia apartment she shared with her infant son. While Teleguz, Sipe’s ex-boyfriend and her son’s father, had been a suspect, the investigation had stalled until Aleksey Safanov,[1] imprisoned in Massachusetts on federal charges, provided a tip to United States Marshal Michael Nelson that “he knew of a Russian male that had his wife killed. He said that a Russian male hired a black male from Pennsylvania, Lancaster, Pennsylvania to kill his wife.” J.A. 2828. Safa-nov’s tips led to Edwin Gilkes, and U.S. Marshal Nelson passed the information on to the Harrisonburg Police Department. Ultimately, the investigation resulted in, among other things, a capital murder for hire case against Teleguz.
In February 2006, a jury convicted Tele-guz of murder for hire. Teleguz v. Pearson, 689 F.3d 322, 325 (4th Cir.2012). Michael Hetrick, who had actually committed the killing, testified at trial that Teleguz had paid him two thousand dollars to slit Sipe’s throat.
Hetrick’s murder-for-hire allegations were corroborated by both Gilkes and Sa-fanov. Gilkes testified that he had been present at a birthday party where Teleguz hired Hetrick to commit the murder. Gilkes also testified that he accompanied Hetrick to Sipe’s apartment and waited outside for Hetrick during the murder. Gilkes further claimed that he was afraid of Teleguz because he had heard rumors that Teleguz was a member of the Russian mafia.
Safanov testified at Teleguz’s trial that Teleguz attempted to hire him to murder Sipe to avoid paying child support. Safa- *806 nov also testified that Teleguz had spoken to him about the murder after it had occurred, complaining that the man he had hired to kill Sipe had left blood at the scene and offering Safanov money to “eliminate” the killer. Teleguz, 689 F.3d at 326.
In February 2006, a Virginia jury recommended that Teleguz be sentenced to death upon finding two statutory aggravating factors: vileness and future dangerousness. The Supreme Court of Virginia affirmed Teleguz’s conviction and sentence. Teleguz v. Commonwealth, 273 Va. 458, 643 S.E.2d 708 (2007). Teleguz proceeded to file a petition for writ of habeas corpus in state court, which the Supreme Court of Virginia dismissed. Teleguz v. Warden of Sussex I State Prison, 279 Va. 1, 688 S.E.2d 865 (2010).
Teleguz then turned to the federal courts, filing a petition for writ of habeas corpus in the United States District Court for the Western District of Virginia in November 2010. Some of Teleguz’s claims had been adjudicated on the merits in state court while others had been procedurally defaulted. Teleguz, 689 F.3d at 326. Teleguz argued that his defaulted claims should nevertheless be considered, primarily because he had new, reliable evidence that he was actually innocent (“Gateway Innocence Claim”).
In support of his Gateway Innocence Claim, Teleguz offered what we previously described as three categories of evidence. First, Teleguz presented affidavits of witnesses who indicated that they had not seen him at the birthday party during which he was alleged to have hired Hetrick to kill Sipe. Second, he presented evidence to establish that a murder in Ephrata, Pennsylvania alluded to during his trial never occurred. Third, and most importantly, Teleguz presented affidavits in which Gilkes and Safanov recanted testimony they offered at Teleguz’s trial.
Gilkes claimed that he had been coerced into testifying against Teleguz by the prosecutor, who “made clear that if [he] did not, [he] would have been the one on death row today, not Teleguz.” J.A. 3546. Gilkes executed affidavits in both 2008 and 2010 disavowing aspects of his trial testimony.
Similarly, Safanov, who had left the United States for Kazakhstan and Kyrgyzstan, ostensibly submitted an affidavit. According to that affidavit, as well as affidavits submitted by Teleguz’s defense team, which had been in contact with someone claiming to be Safanov, Safanov asserted that he had never discussed Sipe’s murder with Teleguz and agreed to testify falsely during Teleguz’s trial because both the prosecutor pursuing Tele-guz and a United States marshal told him that if he cooperated, he would be eligible for perks including an S visa allowing him to remain in the United States despite pending gun charges.
In August 2011, the district court denied Teleguz habeas relief without holding a hearing. Teleguz v. Kelly, 824 F.Supp.2d 672 (W.D.Va.2011). Teleguz appealed, arguing that he was “entitled to an evidentia-ry hearing to demonstrate a miscarriage of justice.” Petitioner’s Br. at ii. This Court vacated and remanded for a rigorous Gateway Innocence Claim analysis, strongly suggesting that an evidentiary hearing may be warranted to assess the credibility of the recanting witnesses. Teleguz, 689 F.3d 322.
On remand in district court, Teleguz changed his tune, “arguing that an eviden-tiary hearing [was] unnecessary” and that the district court should decide his Gateway Innocence Claim “on the cold record.” Teleguz v. Pearson, No. 7:10CV00254, 2012 WL 6151984, at *2 (W.D.Va. Dec. 11, *807 2012). “In light of th[is Court’s] instructions,” however, the district court found that an evidentiary hearing was “necessary.” Id. at *3. Accordingly, it held a several-day evidentiary hearing in November 2013.
At the hearing, Gilkes appeared but refused to testify. And Safanov did not appear, even by deposition or phone. In other words, neither of the recanters testified in support of their recantations. Meanwhile, Hetrick appeared and testified in detail and consistent with his trial testimony, i.e., that Teleguz had hired him to kill Sipe. Prosecutor Marsha Garst, whom Gilkes and Safanov accused of threatening them into testifying against Teleguz, appeared and testified that those accusations were false. And U.S. Marshal Nelson testified that Safanov’s accusation that Nelson had told Safanov he could benefit from an S visa for assisting the government was also false.
Ultimately, in July 2014, the district court again denied Teleguz’s petition. The district court held that it “c[ould] not conclude that more likely than not, given the overall, newly supplemented record, no reasonable juror would have found Teleguz guilty beyond a reasonable doubt. As such, the petitioner has not made a threshold showing of actual innocence to permit review of his procedurally-defaulted claims.” Teleguz v. Davis, No. 7:10CV00254, 2014 WL 3548982, at *20 (W.D.Va. July 17, 2014) (quotation marks and citation omitted). The district court also rejected Teleguz’s claim that he had made a sufficient showing that his habeas attorneys had been deficient in failing to pursue the Ephrata, Pennsylvania murder issue (“Martinez Claim”). This appeal ensued. We now review the district court’s denial of Teleguz’s habeas petition de novo. Wolfe v. Johnson, 565 F.3d 140, 160 (4th Cir.2009).
II.
The Antiterrorism and Effective Death Penalty Act of 1996 (“AEDPA”) sharply limits federal habeas relief. Sharpe v. Bell, 593 F.3d 372, 378-79 (4th Cir.2010). If a state court adjudicates a petitioner’s claims on the merits, a federal court may provide relief only if the resulting state court decision “[i]s contrary to or involved an unreasonable application of federal law” or “[i]s based on an unreasonable determination of the facts in light of the evidence” that was before it. 28 U.S.C. § 2254(d).
Generally, a federal court may not consider claims that a petitioner failed to raise at the time and in the manner required under state law. House v. Bell, 547 U.S. 518, 536, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006). Exceptions exist, however, when “the prisoner demonstrates cause for the default and prejudice from the asserted error.” Id.
One such exception is made for cases in which a compelling showing of actual innocence enables a federal court to consider the merits of a petitioner’s otherwise defaulted claims. See Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). In such cases, new evidence “establish[es] sufficient doubt about [a petitioner’s] guilt to justify the conclusion that his execution would be a miscarriage of justice unless his conviction was the product of a fair trial.” Id. at 316, 115 S.Ct. 851 (emphasis omitted).
Another such exception exists for ineffective-assistance-of-trial-counsel claims where “(1) the ineffective-assistance-of-trial-counsel claim is a substantial one;” (2) the “cause” for default “consists] of there being no counsel or only ineffective counsel during the state collateral review proceeding;” (3) “the state collateral review proceeding was the initial review *808 proceeding in respect to the ineffective-assistance-of-trial-counsel claim;” and (4) state law requires that an ineffective assistance claim “be raised in an initial-review collateral proceeding.” Fowler v. Joyner, 753 F.3d 446, 461 (4th Cir.2014), cert. denied, — U.S. -, 135 S.Ct. 1530, 191 L.Ed.2d 562 (2015) (quotation marks and citations omitted). When these conditions are met, the merits of an otherwise defaulted ineffective assistance claim may be reached. Martinez v. Ryan, — U.S. -, 132 S.Ct. 1309, 1320, 182 L.Ed.2d 272 (2012).
Both of these exceptions are, in essence, procedural mechanisms. If the requisite showing is made, they allow otherwise defaulted substantive claims to be reached on the merits. Id.; Sibley v. Culliver, 377 F.3d 1196, 1207 n. 9 (11th Cir.2004) (distinguishing between a substantive claim and a gateway claim through which a habeas petitioner must pass to have his substantive claims considered on the merits). Stated differently, although a petitioner claims actual innocence, for example, for purposes of asserting a gateway innocence claim, such an innocence claim “does not by itself provide a basis for relief. Instead, his claim for relief depends critically on the validity” of his procedurally defaulted claims. Coleman v. Hardy, 628 F.3d 314, 318 (7th Cir.2010) (quotation marks omitted).
With this legal framework in mind, we turn to Teleguz’s Schlup and Martinez arguments.
A.
With his main argument on appeal, Tele-guz challenges the district court’s rejection of his Gateway Innocence Claim. Teleguz contends that the district court’s analysis was unsound and that its conclusion constitutes reversible error.' With both contentions, we disagree.
When a petitioner raises a gateway innocence claim, it must be supported by “new reliable evidence.” Schlup, 513 U.S. at 324, 115 S.Ct. 851 (emphasis added). However, in its consideration of a petitioner’s Schlup gateway innocence claim, the district court “must consider ‘all the evidence’ old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under ‘rules of admissibility that would govern at trial’ ” House, 547 U.S. at 538, 126 S.Ct. 2064 (quoting Schlup, 513 U.S. at 327-28, 115 S.Ct. 851).
In cases with recantations, evidentiary hearings “may be necessary to assess whether [they] are credible.... ” Teleguz, 689 F.3d at 331 (quotation marks and citation omitted). Without doubt, “the district court is permitted under Schlup to ‘make some credibility assessments’ when, as here, a state court has not evaluated the reliability of a petitioner’s ‘newly presented evidence [that] may indeed call into question the credibility of the witnesses presented at trial.’ ” Id. at 331-32, 115 S.Ct. 851 (quoting Schlup, 513 U.S. at 330, 115 S.Ct. 851).
Ultimately, the district court must determine whether “it is more likely than not that no reasonable juror would have found [the] petitioner guilty beyond a reasonable doubt.” Schlup, 513 U.S. at 328, 115 S.Ct. 851. Or, as this Court put it, “to satisfy the Schlup standard] a petitioner must ... demonstrate that the totality of the evidence would prevent any reasonable juror from finding him guilty beyond a reasonable doubt, such that his incarceration is a miscarriage of justice.” Teleguz, 689 F.3d at 329. Only then may the district court reach the merits of the petitioner’s procedurally defaulted claims. House, 547 U.S. at 538, 126 S.Ct. 2064.
*809 The Supreme Court has underscored that “the Schlup standard is demanding” and permits merits review only-in “extraordinary” cases. House, 547 U.S. at 538, 126 S.Ct. 2064 (quotation marks omitted). See also McQuiggin v. Perkins, — U.S. -, 133 S.Ct. 1924, 1936, 185 L.Ed.2d 1019 (2013) (“We stress once again that the Schlup standard is demanding. The gateway should open only when a petition presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.”) (quotation marks and citation omitted). At the same time, though, the Schlup standard does not require absolute certainty about the petitioner’s innocence. Rather, the petitioner must demonstrate that more likely than not, in light of new and reliable evidence, no reasonable juror would find him guilty beyond a reasonable doubt. House, 547 U.S. at 538, 126 S.Ct. 2064.
Based on the record before us now, we, like the district court, are unable to reach the conclusion that “the totality of the evidence would prevent any reasonable juror from finding [Teleguz] guilty beyond a reasonable doubt.” Teleguz, 689 F.3d at 329.
1.
We focus first on the Gilkes and Safanov recantations, which are at the heart of Teleguz’s Gateway Innocence Claim. Gilkes recanted several key aspects of his trial testimony, which he claimed were the products of coaching and intimidation. Specifically, in his post-trial affidavits, Gilkes recanted, among other things, his claim that Teleguz was present at David Everhart’s birthday party, where Hetrick contended that Teleguz had hired him to kill Sipe. Further, Gilkes claimed that he “never heard or overheard Ivan Teleguz hiring Michael Hetrick to kill his ex-girlfriend,” J.A. 3484, and claimed that he did not “know who hired Hetrick to kill Ms. Sipe, or if anyone hired him.” J.A. 3548.
Gilkes claimed that he had been coerced into testifying against Teleguz by the prosecutor, who “made clear that if [he] did not, [he] would have been the one on death row today, not Teleguz.” J.A. 3546. Per, Gilkes “[m]ost of [his] testimony was fabricated,” id., and he “said those things because Marsha Garst told [him] that she was only interested in information that put this murder on Ivan Teleguz.” J.A. 3484. Gilkes' plainly stated in his affidavits that Garst and Investigator Whitfield, the police detective on the case, told him to say that Teleguz was responsible for Ms. Sipe’s murder. For example, Gilkes asserted:
I said those things because Marsha Garst told me that she was only interested in information that put this murder on Ivan Teleguz. During at least one interrogation of me by Marsha Garst, she directed the investigator to turn off the tape recorder. While the tape was off, she told me that it was Ivan Teleguz that she was interested in. She already knew that Michael Hetrick had done the killing because she had his DNA at the scene. She said that any deal I got would depend on me giving her Ivan Teleguz, and she told me to give her as much about Ivan Teleguz as I could.
J.A. 3484.
Likewise, Safanov later claimed that he never discussed Sipe’s murder with Tele-guz and agreed to testify during Teleguz’s trial only because both the prosecutor pursuing Teleguz and a United States marshal told him that if he cooperated, he would be eligible for perks including a visa allowing him to stay in the United States.
*810 Because Safanov had left the United States, contact with him has been only-long-distance. Teleguz’s defense team had had conversations with someone claiming to be Safanov and submitted affidavits stating, for example:
In the first phone'call, we identified ourselves as Teleguz’s lawyers. Safanov told us that Marcia [sic] Garst, the Commonwealth’s Attorney who prosecuted Teleguz, guaranteed she would get Safa-nov an S Visa. An S Visa would allow him to stay in the country despite his criminal convictions. Garst promised Safanov she would get him an S Visa, if Safanov would help Garst get the death penalty for Teleguz.
J.A. 3555. Similarly, the recanting affidavit executed by someone claiming to be Safanov himself stated, among other things:
Ivan has never told me that he had arranged to have Stephanie Sipe killed, and my testimony at his capital murder trial, that he did tell me this, was false. I was pressured by Marsha Garst, the Virginia prosecutor in Ivan’s capital case, to testify that Ivan had arranged the murder so that Ivan would get the ’ death penalty. In exchange for my testimony, Garst offered to help me in a number of ways, including help getting a good deal on federal criminal charges I was facing at the time.
J.A. 3595.
Neither Safanov nor Gilkes testified at the evidentiary hearing. The district court thus noted its “limited ability to judge their truthfulness.” Teleguz, 2014 WL 3548982, at *9.
By contrast, the government witnesses accused of misconduct — Garst, Whitfield, and Nelson — testified at the evidentiary hearing. For exampié, Safanov claimed Garst had visited him in prison with cookies she had baked for him. Garst’s response at the evidentiary hearing: “I do not bake cookies for inmates, nor would I have done that.” J.A. 2893. When asked if she had made Safanov any guarantees about an- S visa, she flatly denied any such allegations, noting “I’m a local state constitutional officer; I cannot make such a representation.” J.A. 2892. And Garst flatly denied having instructed either Safa-nov or Gilkes to lie — either to secure Tele-guz’s capital conviction or for any other reason.
Similarly, when U.S. Marshal Nelson was asked, for example, if he had spoken “with Mr. Safanov about any visa issues that he was facing,” he flatly denied with a “No, sir.” J.A. 2838. Nelson similarly denied having any discussions with Safa-nov’s girlfriend about Safanov’s visa issues. Instead, Nelson confirmed that he had not even known about the S visa program for government cooperators at the pertinent time. Nelson also made plain that he had had no involvement with the Virginia investigation of the Sipe murder after he relayed to the Harrisonburg police the tip information that rekindled the stalled investigation and ultimately led to Teleguz.
Despite the claims of prosecutorial misconduct, at the evidentiary hearing, Garst, Whitfield, and Nelson testified and denied Gilkes’s and Safanov’s accusations of coaching, intimidation, and misconduct. Teleguz’s counsel had the opportunity to cross-examine these witnesses. And the district court found Garst’s, Nelson’s, and Whitfield’s versions of the pertinent events “reasonable,” and their testimony “credible.” Teleguz, 2014 WL 3548982, at *10-11.
In other words, the district court had before it affidavits asserting that Gilkes and Safanov had falsely testified about Teleguz’s guilt at the behest of the prosecution. But the recanting affiants chose *811 not to testify and were not subject to cross-examination. Meanwhile, the government witnesses implicated in Gilkes’s and Safanov’s affidavits took the stand and gave reasonable accounts that the district court believed. The district court therefore credited the prosecution’s version of events and discredited Gilkes’s and Safa-nov’s versions, specifically finding the recanting affidavits “unreliable.” Teleguz, 2014 WL 3548982, at *10.
When we remanded this matter for an evidentiary hearing — at Teleguz’s express request — we made plain that the district court could, and indeed, might need to, make credibility determinations. Teleguz, 689 F.3d at 331. See also Schlup, 513 U.S. at 330, 115 S.Ct. 851 (“[T]he newly presented evidence may indeed call into question the credibility of the witnesses presented at trial. In such a case, the habeas court may have to make some credibility assessments.”). The district court heard our instructions loud and clear, held a several-day hearing, and made the necessary credibility determinations.[2]
Credibility determinations are “deserving of the highest degree of appellate deference.” Evergreen Int’l, S.A. v. Norfolk Dredging Co., 531 F.3d 302, 308 (4th Cir.2008) (quotation marks and citation omitted). See also, e.g., O’Dell v. Netherland, 95 F.3d 1214, 1250 (4th Cir.1996) (en banc) (noting that “the district court’s factual findings regarding the credibility of testimony it has actually heard are findings subject to review only under a clearly erroneous standard”). Indeed, the court below, and “not the reviewing court, weighs the credibility,” and we generally “do not review credibility determinations.” Smith v. Bank of Am., N.A., 443 Fed.Appx. 808, 809 (4th Cir.2011) (unpublished).
We see no basis for substituting our own credibility determinations for the district court’s. Gilkes and Safanov claimed that they lied at trial because they were instructed and intimidated into doing so by the prosecution. But Gilkes and Safanov refused to testify at the evidentiary hearing and affirm their recantations or be subject to cross-examination. Meanwhile, the implicated prosecution witnesses— Garst, Whitfield, and Nelson — did testify, were cross-examined by Teleguz’s counsel, and were deemed credible. Under these circumstances, we uphold the district court’s determination that the recanting affidavits did not constitute the “reliable” new evidence that Schlup requires. Schlup, 513 U.S. at 324, 115 S.Ct. 851.[3]
2.
In contrast to Gilkes and Safanov, He-trick testified at the evidentiary hearing. Teleguz argues that the district court erred in finding Hetrick’s testimony credible. Again, we see no basis for disturbing the district court’s determination.[4]
*812 At trial and at the evidentiary hearing, Hetrick testified that Teleguz agreed to pay him two thousand dollars to kill Sipe, who had taken money and drugs from Teleguz and sought child support for their infant son. Teleguz later drove Hetrick and Gilkes from Lancaster, Pennsylvania to Harrisonburg, Virginia, where Sipe lived, showed them her apartment, and then left them to establish an alibi. He-trick gained entry into the apartment and slit Sipe’s throat as Teleguz had directed. However, Sipe fought back and, in the struggle, Hetrick wounded his hand with his own knife. Afterwards, while cleaning his wound, he discovered the couple’s infant son in the bathtub. Hetrick turned off the bathtub water and left.
The district court had the opportunity to “observe[ ] [Hetrick’s] demeanor and testimony first-hand” and found his account detailed, consistent with his trial testimony, and “highly creditable.” Teleguz, 2014 WL 3548982, at *17. The district court did not wholly discount Hetrick’s testimony because he secured a better deal with the government for .cooperating or because of the risks associated with later changing his account. Instead, the district court noted, for example, that “[l]eniency for government cooperators is common, and absent evidence of other misconduct, their motivation to help themselves does not render their statements necessarily unreliable.” Id. at *16. Again, credibility determinations are “deserving of the highest degree of appellate deference,” Evergreen Int'l, S.A., 531 F.3d at 308 (quotation marks and citation omitted), and we see no basis for swapping the district court’s credibility determination out in favor of our own.
Teleguz attempts to make much of the fact that the district court, at the warden’s request, appointed Hetrick — and Gilkes— independent counsel for purposes of the evidentiary hearing. We refuse Teleguz’s invitation to read impropriety into either the warden’s or the district court’s looking out for Gilkes’s, Hetrick’s, or anyone’s, rights and interests by appointing them independent counsel under circumstances such as these. And while the language the warden’s counsel used in the motions to appoint independent counsel was, no doubt, stark, the warden’s counsel was stating a seemingly obvious truth: that testifying at an evidentiary hearing in a manner that contradicted how they testified at trial could have serious legal consequences such as perjury or broken plea agreements for Gilkes, Safanov, Hetrick, or any witness.
Further, Teleguz heavily relies on Wolfe v. Clarke, 718 F.3d 277 (4th Cir.2013), cert. denied, — U.S.-, 134 S.Ct. 1281, 188 L.Ed.2d 299 (2014). But we fail to see how Wolfe advances the ball for Teleguz. In Wolfe, the prosecution illicitly threatened a recanting witness whose recantation had already been deemed candid and persuasive at an evidentiary hearing to impact how he would testify at Wolfe’s retrial. Indeed, the Wolfe proceedings were riddled with grave prosecutorial misconduct such as interview recordings that authorities refused to hand over and joint meetings with key witnesses to choreograph and coordinate testimony. Under those circumstances, the district court found that Wolfe had met the Schlup standard and that he had presented meritorious claims. Id. at 280-81. Yet even in the face of all that, this Court held that the district court abused its discretion in barring the government from retrying Wolfe, stating -“[w]e are confident that the retrial will be properly handled, and, if convictions result, that the appellate courts will perform their duties.” Id. at 289.
3.
Teleguz also contends that he “presented substantial evidence that he was not *813 even present at the birthday party” where, according to Hetrick’s and Gilkes’s trial testimony and Hetrick’s hearing testimony, Teleguz had hired Hetrick to kill Sipe. Petitioner’s Br. at 41. According to Tele-guz, this undermines the credibility of He-trick’s story. In reality, however, the evidence presents a much more mixed picture as to whether Teleguz attended the birthday party.
Teleguz submitted several affidavits in which individuals stated that they had not seen Teleguz at the birthday party. Importantly, two such affidavits belonged to the party hosts, whom Teleguz deposed de bene esse before the evidentiary hearing. The female host — Latesha ^Everhart, who is also Gilkes’s sister — testified at deposition that her husband was so drunk the night of the party that he would not have been in a position to know who was there.
Further, and crucially, Everhart testified that “half of the stuff in [her affidavit] isn’t true.” J.A. 3231. She stated that Teleguz “could have been there.” J.A. 3204. “Edwin [Gilkes] could have let him in upstairs without coming through the front door.” J.A. 3237.[5] In other words, the party hosts had no idea whether Tele-guz was at the party or not. The female host thus expressly disavowed the statement in her affidavit that “Ivan Teleguz was definitely not at my husband[’s] birthday party.” J.A. 3204. What’s more, she raised serious questions about the integrity of the affidavits.[6]
In light of the open question the affidavits present as to whether Teleguz had attended the birthday party, we share the district court’s reluctance to find this evidence to be the kind of “reliable” new evidence needed to meet the demanding Schlup standard. Schlup, 513 U.S. at 324, 115 S.Ct. 851
4.
The last category of evidence supporting Teleguz’s Gateway Innocence Claim purportedly establishes that the Ephrata, Pennsylvania murder alluded to during Teleguz’s trial never occurred. But this evidence, even more than the other categories already discussed, fails to add the requisite heft to Teleguz’s Gateway Innocence Claim.
Gilkes’s specific testimony about the Ephrata, Pennsylvania murder was that “down in Ephrata one day ... a couple of [ ] Russians on Main Street were outside the parking lot of the rec center. There was two men that got out of the car. We figured they were both, they were both Russians to the best of my knowledge.” J.A. 4420. Gilkes continued that “the one walked up and said that ... if his boys didn’t have the money at a certain time that in a couple of days that some of them would be killed.” Id. at 4421. Gilkes testified that Teleguz did not make that statement but “was present during the statement.” Id. Gilkes reported that someone was later killed, “a week, three days to a week after that in Ephrata Street, on Main Street.” Id. at 4422. In other words, Gilkes plainly did not testify that Teleguz *814 had killed anyone in Ephrata, Pennsylvania.
During the evidentiary hearing, Teleguz presented evidence that no murder had ever occurred outside the recreation center in Ephrata, Pennsylvania (though other evidence indicated that a murder in which Teleguz may have been involved had occurred in a nearby town). He thus suggested that the jury was misled into believing that he had been behind a phantom murder.
We fail to see how the Ephrata, Pennsylvania murder issue could show that Tel-eguz was actually innocent of Sipe’s murder in Harrisonburg, Virginia. The Ephrata, Pennsylvania murder-related evidence thus cannot support a determination that Teleguz had met the “demanding” Schlup standard. House, 547 U.S. at 538, 126 S.Ct. 2064.
5.
Even in the face of the broadened record, we cannot say that this is the “rare” and “extraordinary” case in which it is more likely than not that no reasonable jury would have convicted Teleguz as the jury did here. House, 547 U.S. at 538, 554, 126 S.Ct. 2064. A brief overview of a case in which the Supreme Court found the gateway innocence standard to be met is instructive regarding what a sufficiently strong gateway innocence case looks like and why the mixed picture here does not meet the standard.
In House, the defendant was convicted and sentenced to death in large part based on forensic evidence, specifically semen found on the victim’s nightgown and underwear, and blood stains found on the defendant’s pants. House, 547 U.S. at 540-41, 126 S.Ct. 2064. Later DNA analysis, however, showed that the semen was in fact the victim’s husband’s, not the defendant’s, and that the blood stains on the defendant’s pants likely resulted from the victim’s blood spilling out of vials taken into evidence and transported in the same container, at the same time, as the defendant’s pants. Id. at 541-45, 126 S.Ct. 2064. Further, there existed evidence that the victim’s husband physically abused her, that she had reported shortly before her death that she was afraid of her husband and wanted to leave him, and even that her husband had later confessed to having killed her. Id. at 548-49, 126 S.Ct. 2064. While the Supreme Court stressed that “it bears "repeating that the Schlup standard is demanding and permits review only in the ‘extraordinary,’ case,” id. at 538, 126 S.Ct. 2064, it deemed House to be that “rare case where — had the jury heard all the conflicting testimony — it is more likely than not that no reasonable juror viewing the record as a whole would lack reasonable dpubt.” Id. at 554, 126 S.Ct. 2064. This case, while perhaps troubling, is no House.
In sum, the district court applied the correct legal framework to the totality of the evidence before it. It made the credibility determinations we had ’ indicated it had the authority to make. We must give those determinations “the highest degree of appellate deference,” Evergreen Int’l, S.A., 531 F.3d at 308 (quotation marks and citation omitted). Particularly in light of those credibility determinations, we, like the district court, “cannot conclude that more likely than not, given the overall, newly supplemented record, no reasonable juror would have found Teleguz guilty beyond a reasonable doubt.”[7] Teleguz, 2014 *815 WL 3548982, at *20 (quotation marks and citation omitted). And because the Gateway Innocence Claim was Teleguz’s hook for moving past procedural default, we refrain from addressing the underlying, defaulted claims.
B.
With his second argument on appeal, Teleguz challenges the district court’s rejection of his Martinez Claim. Teleguz contends that the district court’s analysis was fatally flawed by a mistaken belief that the jury had not been told that Tele-guz had been involved in the Ephrata, Pennsylvania murder. We see no such fatal flaw.
As an initial matter, we note that the district court erred to the extent it suggested that Teleguz had failed to preserve the Martinez issue. See Teleguz, 2014 WL 3548982, at *22 (“Martinez was decided by the Supreme Court on March 20, 2012, prior to oral argument in Teleguz’s appeal to the Fourth Circuit, but was not raised there_”). In footnote 12 on pages 23 to 24 of his- pre-remand opening brief, Tele-guz raised the Martinez issue and acknowledged the lack of then-extant legal support but expressly noted the argument for preservation purposes. We therefore move to the merits, which the district court also addressed.
Like Schlup, Martinez is an exception that enables habeas petitioners to obtain merits review of otherwise procedurally defaulted claims under certain circumstances. Specifically, Martinez claims may be reviewed only if, among other things, “the ineffeetive-assistance-of-trial-counsel claim is a substantial one,” and the cause behind the default was “no counsel or only ineffective counsel” during the collateral review proceedings. Fowler, 753 F.3d at 461 (quotation marks and citations omitted).
Regarding the requirement that there be a “substantial” claim, the Supreme Court held that a prisoner must “demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.” Martinez, 132 S.Ct. at 1318. Relatedly, to show ineffective assistance, “the petitioner must make a ‘substantial’ showing with respect to both counsel’s competency (first-prong Strickland) and prejudice (second-prong Strickland).” Brian R. Means, Federal Habeas Manual § 9B:62 (citing Clabourne v. Ryan, 745 F.3d 362, 376 (9th Cir.2014)).
As to the specific elements of the ineffective assistance claim, a petitioner must make a substantial showing of incompetency, i.e., “that counsel made errors so serious that counsel was not functioning as the counsel guaranteed ... by the Sixth Amendment.” DeCastro v. Branker, 642 F.3d 442, 450 (4th Cir.2011) (quotation marks and citation omitted). Further, the petitioner must make a substantial showing that “counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable,” i.e., that there was “a substantial, not just conceivable, likelihood of a different result.” Id. (quotation marks and citations omitted).
Teleguz faults his state habeas counsel for failing to investigate and raise an inef *816 fective assistance of trial counsel claim relating to the Ephrata, Pennsylvania murder allegations not just at the guilt phase but also at the penalty phase. According to Teleguz, “the jury was told that Teleguz was ‘at the recreation center in this small town and that Ivan Teleguz and two other people came in, walked up to some guy, blew him away and told you they’ll be back for the other two.’ ” Petitioner’s Br. at 59 (citing J.A. 4403).
In reality, however, the jury was not “told” that Teleguz “blew” anyone “away,” but rather that Gilkes did not recall having made any such statement and that he saw no such thing. Specifically, on cross-examination, Gilkes was asked, “Do you remember telling the investigators that you were at the recreation center in this small town and that Ivan Teleguz and two other people came in, walked up to some guy, blew him away and told you they’ll be back for the other two?” J.A. 4403. Gilkes responded, “No, I don’t recall it.” Id. When asked again, “You don’t recall saying that?” Gilkes again plainly stated “No.” Id.
On redirect, Gilkes clarified: “[D]own in Ephrata one day ... a couple of [ ] Russians on Main Street were outside the parking lot of the rec center. There was two men that got out of the car. We figured they were both, they were both Russians to the best of my knowledge.” J.A. 4420. Gilkes continued that “the one walked up and said that ... if his boys didn’t have the money at a certain time that in a couple of days that some of them would be killed.” Id. at 4421. Gilkes testified that Teleguz did not make that statement but “was present during the statement.” Id. Gilkes reported that someone was later killed, “a week, three days to a week after that in Ephrata Street.” Id. at 4422. But Gilkes did not state or suggest that he witnessed that murder or knew who had committed that murder — and he certainly did not testify, nor did any other trial witness, that Teleguz “blew someone away” in Ephrata, Pennsylvania.
The alleged Ephrata, Pennsylvania murder resurfaced during the prosecution’s closing argument at sentencing. The prosecutor stated “you heard the background of the defendant, how Gilkes told you about this issue in Ephrata, how they had this situation with the Russian folks approaching and posturing about killing someone, and someone ends up dead.” J.A. 5209. Again, no one argued, much less presented evidence, that Teleguz “blew someone away” outside the Ephrata, Pennsylvania recreation center. Teleguz’s suggestion that the jury was informed that “Teleguz was responsible for another murder” is, therefore, inaccurate. Petitioner’s Br. at 60.
Because the jury heard evidence that at best shows that Teleguz was present when another individual threatened to murder someone outside the recreation center in Ephrata, Pennsylvania and that a murder did occur about a week later, and because the lone comment on the issue at sentencing, in the form of closing arguments, referenced “Russian folks” and did not state that Teleguz had murdered anyone in Ephrata, Pennsylvania, it comes as no surprise that habeas counsel failed to make the ineffective assistance claim that Tele-guz now presses — one based on “a misconception of the evidence.” Teleguz, 2014 WL 3548982, at *24.[8]
Moreover, had counsel fully pursued the Ephrata, Pennsylvania murder issue, they *817 may well have decided to let things lie— because evidence presented at the hearing suggested that a murder with a connection to the Ephrata recreation center had in fact taken place and that Teleguz may have been involved. A Pennsylvania State Police “master trooper” who investigated Russian organized crime in Lancaster County testified that a man of Russian dissent named Yvegeniy Belyy was murdered in Elizabeth Township, Pennsylvania in April 2001. J.A. 2852. While investigating the Belyy murder, the Pennsylvania State Police interviewed “various individuals who talked about a fight or embarrassment at the Ephrata Rec Center or in that vicinity.” Id. at 2855. The master trooper testified that “Ivan Teleguz first came to light in the [Belyy] homicide investigation.” Id. at 2854. Record evidence also suggests that Teleguz may have been the source of the firearm for the Belyy murder (see, e.g., J.A. 3814) — a fact consistent with Teleguz’s having been “an eager vendor of deadly weapons.” Teleguz, 492 F.3d at 85.
A brief overview of a case in which the Supreme Court found prejudice is instructive as to why the record does not support finding prejudice here. In Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), the defendant was convicted of murder and sentenced to death. Wiggins’s sentencing jury heard only one significant mitigating factor- — that Wiggins had no prior convictions. Id. at 537, 123 S.Ct. 2527. But “mitigating evidence counsel failed to discover and present in this case [was] powerful.” Id. at 535, 123 S.Ct. 2527. The evidence showed that ‘Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother. He suffered .physical torment, sexual molestation, and repeated rape during his subsequent years in foster care. [And] [t]he time Wiggins spent homeless, along with his diminished mental capacities, further augment his mitigation case.” Id. Given this “powerful” evidence, the Supreme Court concluded that, “[h]ad the jury been able to place petitioner’s excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance.” Id. at 537, 123 S.Ct. 2527. Accordingly, the Supreme Court found the high prejudice bar to have been met. Without doubt, this case is no Wiggins.
Finally, completely independent of anything having to do with the Ephrata, Pennsylvania murder issue, the jury recommended that Teleguz be sentenced to death based on finding vileness beyond a reasonable doubt. Teleguz, 643 S.E.2d at 723 (“In- this case, the Commonwealth presented evidence on both the vileness and future dangerousness aggravators. The jury found both aggravators were proven beyond a reasonable doubt.”).. Evidence supporting that finding included: Tele-guz’s having “planned the murder to avoid his responsibility of supporting his child;” Teleguz’s having directed that “the murder be committed in the apartment without regard to the well-being of his child who would likely be present;” and Teleguz’s having specified “the actual manner of the murder — cutting the victim’s throat,” with physical attributes including “a deep stab wound to Sipe’s neck which resulted in massive external and internal bleeding, causing Sipe to drown in her own blood.” Id. at 724. In light of the independent, additional statutory aggravator of vileness, Teleguz’s death sentence would stand regardless of his Martinez claim.
In sum, on the record as it exists — as opposed to how it has been mischaracter-ized — we must reject Teleguz’s suggestion that “false evidence that Teleguz was responsible for another murder was the most powerful imaginable aggravating evidence” *818 and thus also his contention that there exists a “reasonable probability that disproving that evidence would have changed the outcome.” Petitioner’s Br. at 65 (quotation marks and citation omitted). Instead, Teleguz has failed to “demonstrate that the claim” — grounded in a misconception of the trial transcript — “has some merit.” Martinez, 132 S.Ct. at 1318. And he has likewise failed to make a substantial showing that his “counsel’s errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable.” DeCastro, 642 F.3d at 450 (quotation marks and citation omitted).[9]
III.
For these reasons, we affirm the district court’s dismissal of Teleguz’s petition.

AFFIRMED

. Safanov was also Teleguz’s co-defendant in a firearms possession and sales case in which Safanov pled guilty and Teleguz went to trial and was convicted on all counts. United States v. Teleguz, 492 F.3d 80 (1st Cir.2007).

. Nowhere in our prior opinion did we "order,” Petitioner’s Br. at 28, the district court to make a finding on remand regarding whether the circumstances surrounding the Gilkes and Safanov recantations were the result of coercion, bribery, or misdealing.

. The district court also noted inconsistencies and gaps in the recanting affidavits. That discussion is, however, tangential to the larger thrust, i.e., the prosecutorial intimidation and influence, which is thus our focus.

.Teleguz plainly overreaches in trying to suggest that in stating "having observed his demeanor and testimony first-hand, I believe that Hetrick's evidence alone was sufficient to have convinced the jury of Teleguz’s guilt,” Teleguz, 2014 WL 3548982, at *17, the district court thereby “rejected” the state court's statement that "to return a guilty verdict, the jury had to believe the testimony of Safanov, Gilkes, and Hetrick.” Petitioner's Br. at 30-32.

. Gilkes independently confirmed that, to enter his room, he would "go up through the back of the house through the fire escapes and come in through a window.” J.A. 4372.

. Everhart testified in her deposition that a young woman visited her, wrote some things down, and left. Several weeks later, Everhart was asked to sign a paper, presumably the affidavit, but never given her own copy. Ev-erhart was asked: “Do you have any reason to think that the affidavit you signed was altered or changed?” J.A. 3230-31. And she responded in the affirmative: “Yeah, I do.... Because half of the stuff in there isn’t true.” Id. at 3231.

. Teleguz seizes on the district court's use of the word "I” to suggest that the court failed to consider how a jury would react to the newly supplemented evidentiary record. We reject a myopic focus on the pronouns used but instead look to what the district court *815 actually did. Without doubt, the district court held that it was not "more likely than not, given the overall, newly supplemented record, [that] no reasonable juror would have found Teleguz guilty beyond a reasonable doubt.” Teleguz, 2014 WL 3548982, at *20. Teleguz’s assertion that the district court "never answered” the "essential question” of whether "reasonable jurors ... would still find guilt beyond a reasonable doubt,” Petitioner’s Br. at 26, is thus plainly incorrect.

. Our own characterization of the evidence in our earlier opinion was also not as tightly tethered to the actual record as it could have been. But the trial transcript, quoted extensively above but not in our prior opinion, speaks for itself.

. While Teleguz argues that the district court should have allowed additional discovery and presentation on this claim, the record is replete with evidence about the Ephrata, Pennsylvania murder issue. Further, the "record refutes the applicant's factual allegations.” Schriro v. Landrigan, 550 U.S. 465, 474, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007). We thus reject this argument.