CORRECTED COPY

# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
BERGER, FEBBO, AND SCHASBERGER
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Specialist MALCOLM R. TURNER**
**United States Army, Appellant**

ARMY 20160131

Headquarters, Fort Campbell
Matthew A. Calarco, Military Judge
Colonel Susan K. Arnold, Staff Judge Advocate

For Appellant: Captain Zachary A. Gray, JA[1] (argued)[2]; Colonel Mary J. Bradley, JA; Captain Joshua B. Fix, JA; Captain Zachary A. Gray, JA (on brief); Lieutenant Colonel Christopher D. Carrier, JA; Captain Heather M. Martin, JA; Captain Zachary A. Gray, JA (on reply brief); Colonel Elizabeth Marotta, JA; Lieutenant Colonel Tiffany D. Pond, JA; Major Todd W. Simpson, JA; Captain Zachary A. Gray, JA (on brief on specified issue).

For Appellee: Captain Meredith M. Picard, JA (argued); Lieutenant Colonel Eric K. Stafford, JA; Major Austin L. Fenwick, JA; Captain Joshua Banister, JA (on brief); Colonel Steven P. Haight, JA; Major Hannah Kaufman, JA; Captain Meredith M. Picard, JA (on brief on specified issue).

30 November 2018

-----------------------------------
MEMORANDUM OPINION
-----------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

---

[1] Corrected

[2] The court heard oral argument on 26 September 2018 at Temple University Beasley School of Law as part of the court's oral outreach program.

FEBBO, Judge:

What started as a dispute over $200 a month in child support payments turned into a conspiracy between appellant and his wife to murder his ex-girlfriend and the mother of his child. In furtherance of their conspiracy, appellant shot his ex-girlfriend three times. Fortunately, she survived.

At separate trials, appellant and his spouse were charged with attempting to murder and other offenses, under both conspiracy and principal theories of liability.[3] Both were convicted and received, as part of their punishment, confinement for life without eligibility for parole. As proven by the government at the trials, appellant was the brawn who pulled the trigger and his spouse was the so-called brains pulling the strings.

This case is before us for review pursuant to Article 66(c), UCMJ, 10 U.S.C. § 866(c). Appellant raises seven issues on appeal, three of which merit discussion, and two warrant relief. First, we resolve against appellant his claim that the government impermissibly asserted different theories of criminality at the two trials. Second, we address whether the evidence of obstruction of justice is factually sufficient. Finding in favor of appellant, we grant relief. Third, we address whether appellant's convictions for maiming and attempted murder should be merged. We accept the government's concession at trial that the offenses were charged in the alternative and conditionally dismiss the maiming specification. Finally, we discuss one issue, raised personally by appellant that the charge of attempted premeditated murder, the Specification of Charge I, fails to state an offense.[4] We find it states an offense by necessary implication.

---

[3] An enlisted panel sitting as a general court-martial convicted appellant, contrary to his pleas, of one specification of attempted premeditated murder, one specification of maiming, one specification of conspiracy to commit premediated murder, and one specification of obstruction of justice, in violation of Articles 80, 124, 81, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 880, 924, 881, and 934 (2012) [UCMJ]. The panel sentenced appellant to a dishonorable discharge, confinement for life without the eligibility for parole, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the adjudged sentence and credited appellant with 599 days confinement against his sentence.

[4] The remaining matters raised personally by appellant warrant neither discussion nor relief. *See United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

**BACKGROUND**

Appellant, Specialist (SPC) Malcolm Turner and the victim, SPC CSG, met in Korea in December 2012 and developed a sexual relationship. At the time, SPC CSG did not know appellant was married to Sergeant (SGT) Annelyntherese Turner, his charged co-conspirator.[5] The relationship continued for several months until appellant admitted he was married. Shortly afterward, SPC CSG learned she was pregnant with appellant's child.

Specialist CSG left Korea for Fort Campbell, Kentucky and gave birth to their son in October 2013. Appellant also left Korea and was stationed at Fort Carson, Colorado with his spouse. Specialist CSG got married and she and her husband raised and supported appellant's son.

Appellant and SPC CSG rarely spoke until she filed a formal claim for child support. Appellant originally verbally agreed to pay $200 a month. However, after paying $100, he stopped making any child support payments and tried to avoid taking a paternity test. Appellant and SPC CSG continued to discuss the non-payment of child support via social media. Sergeant Turner found out about appellant's relationship with SPC CSG and contacted her. Specialist CSG informed SGT Turner that appellant was the father of her child and she was demanding child support.

Upon learning of her husband's infidelity, SGT Turner began a series of manipulative text messages with appellant. These messages were introduced in SGT Turner's trial, but not in appellant's trial. Sergeant Turner told appellant that SPC CSG had hired a hitman to kill him. Sergeant Turner also texted appellant that SPC CSG had sent someone to rape SGT Turner and nearly raped their daughter. Sergeant Turner informed appellant that a "cartel" was going to kill him because he had not retaliated against SPC CSG. Sergeant Turner later informed appellant that the cartel decided to kill her instead as a swap for his life. In other messages, SGT Turner expressed a belief that appellant had purchased bullets and was going to kill SPC CSG on his return to Colorado from leave. When appellant did not do that, she confronted him and accused him of falling in love with SPC CSG, getting her pregnant, and not wanting to kill her. Appellant replied to SGT Turner that he did not buy bullets just for show and would "handle" SPC CSG.

In October 2014, appellant accused SPC CSG of putting a hit on him and his family. Specialist CSG denied any hit or threat to appellant and his family.

---

[5] For purposes of clarity we will refer to appellant only as "appellant" and will refer to appellant's wife as "SGT Turner."

Specialist CSG suggested that if he believed the allegations, he should go to court. Appellant responded that only "sissies" or "people that are scared" would go to court.

Appellant had never visited his son and was not sending child support payments. Therefore, he did not know SPC CSG's address. In October 2014, appellant contacted SPC CSG and asked for her address. At first, SPC CSG was reluctant, but appellant explained that he needed the address to visit his son in the future. After discussing the issue with her spouse, SPC CSG gave appellant her address.

Appellant and SGT Turner then drove from Colorado, spent time in Georgia, and arrived in Tennessee on 1 January 2015. Appellant knocked on SPC CSG's apartment door. Specialist CSG thought this was odd since appellant lived in Colorado, had never visited before, and arrived unannounced. He explained he wanted to meet his son. Specialist CSG allowed appellant into the apartment. Appellant inquired whether SPC CSG's spouse was home, looked around the apartment, and asked to use the bathroom. While he was in the bathroom, appellant texted SGT Turner the apartment number. Sergeant Turner then left her daughter in the car and came to the apartment. Once inside, SGT Turner questioned SPC CSG about her relationship with appellant. Appellant also asked questions about why SPC CSG had placed a $20,000 hit on him.

After putting her son down on a couch, SPC CSG got angry about the false allegations and told appellant, "You're starting to piss me the fuck off. You came into my house unannounced and you accused me of something that I don't know what you're talking about." In response, SGT Turner and appellant briefly discussed something that SPC CSG could not hear. Afterward, SGT Turner told appellant, "Well, the choice is up to you. What are you going to do about it?" Appellant turned to SPC CSG and said, "You think you're bad, huh? You think you're bad?" He pulled out a handgun and shot SPC CSG three times in quick succession from seven to eight feet away. All three shots hit SPC CSG.

The first shot pierced SPC CSG's arm. As she spun around from the impact, appellant's second shot struck her in the back. That round shattered a rib, hit her lung and the sac around her heart, and perforated her chest. As SPC CSG fell forward, appellant's third shot hit her in the side of the head and knocked out her teeth. After passing through SPC CSG's face and chest, the second and third shots both hit the couch, with appellant's son nearby.

After the shooting, appellant and SGT Turner ran out of the apartment. In his hurry to leave the crime scene, appellant dropped his phone outside the apartment.

Specialist CSG grabbed her phone, tried to call 911, and followed them out the door. However, since SPC CSG was unable to actually dial the phone, she threw the phone from the top of the apartment stairs at appellant at the bottom of the stairs.

The two neighbors below SPC CSG's apartment, AW and JW, heard three loud bangs and screams. AW went to the door and saw two people running down the stairs. Both were wearing dark clothing. The individual, who was wearing a hoodie, was carrying a large, black object that AW thought was a gun. Specialist CSG ran down the stairs screaming, "He shot me, He shot me." At the bottom of the stairs, SPC CSG pointed to the two individuals who had just run down the stairs and then she collapsed.

AW's husband, JW, was a few seconds behind his wife. JW ran after the two individuals who fled SPC CSG's apartment, but was not able to catch them. However, he was able to get a description of them and the car they were driving. JW identified one of the two people as an African-American male wearing a gray hoodie. He described the car as a Chrysler 300 with Georgia license plates. JW called 911, gave the phone to his wife, and began administering first aid to SPC CSG.[6] Specialist CSG told JW that her baby's father, Malcolm Turner, shot her.

Within two or three minutes, Clarksville Police arrived at SPC CSG's apartment. She informed the first police officer who arrived at the scene that appellant was the shooter. The police secured the area and found appellant's cell phone. They did not recover any weapon. The police put out a description of the car that fled the scene as a Chrysler 300, with dark tinted windows, silver rims, and Georgia plates. About an hour after the shooting, while police were canvassing the neighbors, one of the neighbors identified the Chrysler 300 driving down the street. A patrol vehicle stopped the Chrysler 300.

The vehicle had three occupants. Appellant was driving the vehicle and his spouse, SGT Turner, and their young child were passengers. Police did not find any weapons on appellant. They did find baby wipes with red-brown stains on them and stains on the car seat. Since their initial flight from the apartment, appellant and SGT Turner had changed clothes. Appellant was no longer wearing jeans and a hoodie. Instead, he was wearing a gray tank-top and red pajama pants. Sergeant Turner was wearing a black t-shirt and loose gray sweatpants. Police searched appellant's vehicle and no firearms were found.

---

[6] At trial, the medical professionals who treated SPC CSG testified she would have died without the first aid administered at the scene.

Appellant was charged with attempted murder with premeditation,[7] maiming, conspiring with SGT Turner to commit murder, reckless endangerment of his son, and obstruction of justice by disposing of the firearm used to shoot SPC CSG. Sergeant Turner was charged with attempted murder, conspiring with appellant to commit murder, accessory after the fact, and a false official statement to a law enforcement agent. Appellant was tried first, in March 2016, at a general court-martial before an enlisted panel. Sergeant Turner was tried second, in May 2016, at a general court-martial before a military judge alone. The lead government prosecutor was the same in both cases.

*A. Appellant's Trial*

At appellant's trial, the government called SPC CSG and multiple witnesses who testified about the shooting, SPC CSG's injuries and medical treatment, crime scene investigation, and digital forensic examination of appellant's and SGT Turner's cell phones. The government introduced evidence linking the missing firearm to appellant.

The government's ballistics' expert testified that the .40 caliber shell casings and ammunition all exhibited characteristics of being fired from a Hi-Point brand weapon. The ballistics' expert also testified that hollow-point bullets were used in the shooting. Hollow-point ammunition is specifically designed to expand on impact, release the maximum kinetic energy, and inflict the maximum damage to tissue. One of the exhibits the government admitted at trial was appellant's Fort Carson weapon's registration for a Hi-Point JCP .40 caliber pistol.

The defense theory at trial was that there was no conspiracy or premediated shooting. Through cross-examination, the defense advanced its theory that SPC CSG was the aggressor in the apartment and the shooting was in self-defense and during the heat of passion. Appellant argued there was no evidence that appellant and his wife conspired to kill SPC CSG. Defense counsel argued that SGT Turner's statement was vague about giving appellant some type of choice. At trial, the defense called a crime scene expert to testify about alleged errors in the police department's processing and preservation of the crime scene. The defense argued that the police crime scene investigation was so faulty that the allegedly missing handgun could have been overlooked at the crime scene.

Neither the government nor the defense introduced the text messages between appellant and SGT Turner. As noted above, the text messages tended to demonstrate

---

[7] Although the specification states "attempt to kill with premeditation," we discuss below that the specification sufficiently alleges attempted murder.

that SGT Turner had manipulated appellant into committing the offense. Each side had their reasons for not introducing the evidence. The government correctly thought they could prove the charges without the text messages from the strong evidence, including eyewitness testimony from SPC CSG and the neighbors. For the defense, the text messages would have undermined their theory that (1) appellant acted in self-defense; (2) there was no conspiracy; and (3) the shooting was not premeditated. Since the text messages disclosed that appellant purchased the hollow-point bullets to shoot SPC CSG, this would have been particularly unhelpful to appellant's argument that he did not intend to kill SPC CSG.

Accordingly, there was scant evidence introduced at appellant's trial about a "hit man." While the panel heard that appellant had accused SPC CSG of hiring a hitman, this evidence was unconnected to SGT Turner's manipulation of appellant. Thus, during closing argument the government argued that instead of bringing a gift, appellant had taken a gun to see his son for the first time. The government argued the "hit man" issue was completely ridiculous. In summarizing the exchange about his wife giving appellant a choice immediately prior to the shooting, the government in closing argument argued to the panel that, "[SGT Turner has] given her husband the option. Options had been discussed, Plan A, Plan B. She's given her husband permission to choose which options to take." Furthermore, during argument on the conspiracy charge, the government argued that SGT Turner "gave him the choice to decide which one, and he chose to kill her." The government argued that SGT Turner had given him a green light and he took the opportunity to extinguish a problem in his life. During rebuttal, the government, again, highlighted appellant's choice immediately prior to shooting SPC CSG.

During sentencing proceedings, the government argued appellant's motive was to avoid taking responsibility for his son and not wanting to pay child support. The government argued appellant had "some evil inside him," and was "cold," "calculating," and "depraved." The defense sentencing argument focused on appellant's upbringing, strong family network, and remorse.

*B. SGT Annelyntheresse Turner's Trial*[8]

At SGT Turner's trial, the government, again, called SPC CSG and multiple witnesses who testified about the shooting, SPC CSG's injuries and medical treatment, crime scene investigation, and digital forensic examination of appellant's and SGT Turner's cell phones. The government continued to maintain appellant was the shooter and SGT Turner was responsible as both a principal and co-conspirator

---

[8] On appeal, the court granted appellant's motion to take judicial notice of SGT Turner's record of trial.

for the attempted murder. The government entered into evidence the text messages between appellant and SGT Turner discussing their plan to murder SPC CSG and the cartel's threat to their family.

The defense theory at trial was that there was no conspiracy or premediated shooting. The defense argued that all of the government evidence presented at trial only supported that her husband, appellant, was responsible for the shooting. The defense argued that, at most, SGT Turner only gave appellant a choice. In response to this choice, the defense argued that appellant acted alone in shooting SPC CSG.

In response to the defense theory, the government argued during findings that SGT Turner gave appellant a "Hobson's choice where no matter what he chooses, he loses . . . He either does what [SGT Turner] wants, or either him [sic] of his wife is going to be killed by the cartel. He has no choice at all, so he pulls out the gun and he shoots [SPC CSG]."

## LAW AND DISCUSSION

### A. Conflicting theories of liability

Appellant asserts the government prejudiced appellant by presenting inconsistent theories of culpability at his and his spouse's trials. Appellant argues that at his trial he was portrayed as a coldblooded killer, while at his wife's trial he was portrayed as just a "naive pawn." However, in both cases, the government proved that appellant was the shooter.

As best we can tell, this is an issue of first impression for military courts. However, the United States Supreme Court and other federal appeals and district courts have addressed the right and left limits of when the prosecution's conflicting theories of liability violate due process. *See, e.g., Thompson v. Calderon*; 120 F.3d 1045, 1058 (9th Cir. 1997) (stating "it is well established that when no new significant evidence comes to light a prosecutor cannot, in order to convict two defendants at separate trials, offer inconsistent theories and facts regarding the same crime."); *Smith v. Groose*, 205 F.3d 1045, 1053-54 (8th Cir. 2000) (finding due process violation where prosecution used "inconsistent, irreconcilable" theories to secure convictions against two defendants in different trials for the same offenses); *Johnson v. Horel*, 2010 U.S. Dist. LEXIS 125005 at *43-49 (N.D. Cal. 2010) (finding no due process violation because prosecutor's statements and arguments are inadmissible). Most courts hold that a due process violation will only be found when the inconsistency exists at "the core" of the prosecution's case. *Sifrit v. Nero*, 2014 U.S. Dist. LEXIS 145759 at *80 (D. Md. 2014). "Discrepancies based on rational inferences from ambiguous evidence will not support a due process violation provided the two theories are supported by consistent underlying facts." *Id.* at 82.

The United States Supreme Court has decided only one case involving inconsistent prosecutions, *Bradshaw v. Stumpf*, 545 U.S. 175 (2005). In *Bradshaw*, the Supreme Court considered a prosecutor's use of inconsistent theories involving two co-defendants who were separately prosecuted. *Id.* at 179-80. Stumpf pleaded guilty to murder. *Id.* At his sentencing hearing, Stumpf argued he only participated in the conspiracy and another co-conspirator fatally shot the victim. *Id.* The government argued that the opposite was true and Stumpf was the shooter. *Id.* Stumpf was sentenced to death. *Id.* Afterward, Stumpf's co-conspirator was tried before a jury. *Id.* at 180. At the co-conspirator's trial, the government presented new evidence from a witness who testified that Stumpf's co-conspirator admitted to being the actual shooter. *Id.* The prosecutor, who also prosecuted Stumpf, now argued that the co-conspirator was the principle shooter. *Id.*

On appeal, the Sixth Circuit held that the prosecution's use of inconsistent theories as to the identity of the shooter violated due process and required the invalidation of Stumpf's guilty plea. *Bradshaw*, 545 U.S. at 181-82. The Supreme Court disagreed. *Id.* at 182. It reasoned that the change in the prosecution's theory was made after the guilty plea and "the precise identity of the triggerman was immaterial to [the petitioner's] conviction for aggravated murder."[9] *Id.* at 187. The Court did observe, however, that the "use of allegedly inconsistent theories may have a more direct effect on [the petitioner's] sentence . . . for it [wa]s at least arguable that the sentencing panel's conclusion about [his] principal role in the offense was material to its sentencing determination." *Id.* The Court remanded for a further determination of the claim, "express[ing] no opinion on whether the prosecutor's action amounted to a due process violation, or whether any such violation would have been prejudicial."[10] *Id.*

---

[9] The Court found Stumpf's argument over who was the principle shooter was immaterial because "Ohio law considers aiders and abettors equally in violation of the aggravated murder statute, so long as the aiding and abetting is done with the specific intent to cause death." *Bradshaw*, 545 U.S. at 184.

[10] "Before *Bradshaw*, the Supreme Court had not suggested that inconsistent prosecutorial theories could constitute a due process violation." *DeCastro v. Branker*, 642 F.3d 442, 457-58 (4th Cir. 2011). Justice Thomas's remarks in his *Bradshaw* concurrence strongly evidence this: the "[Supreme] Court has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories." 545 U.S. at 190 (Thomas, J., concurring); *accord DeCastro*, 642 F.3d at 457-58; *Pondexter v. Quarterman*, 537 F.3d 511, 526-27 (5th Cir. 2008).

9

The United States District Court of Oregon recently addressed the issue of inconsistent theories of liability in *Williams v. Belleque*, 2018 U.S. Dist. LEXIS 136034 at *68-83 (D. Or. 2018). We find this case the most similar to appellant's case. In *Williams*, the prosecution first argued Williams was an "autonomous cold-blooded killer" during his sentencing case. *Id*. at *68-70. The prosecution later argued at his co-accused's trial that Williams was a robotic "follower" directed by his co-accused to shoot the victim. *Id*. In addition to dealing with similar issues as presented by appellant and persuasive analysis on how to fairly resolve the issue, Judge Robert E. Jones provides an excellent summary of the law and federal cases addressing alternate theories of liability.

First, as co-conspirators and under principal liability, appellant and SGT Turner were equally culpable for the attempted murder. Similar to *Bradshaw*, appellant is not less culpable than his co-conspirator. This is not a case of actual duress. Appellant was not confronted with an actual choice of kill or be killed. Specialist CSG, having the most wisdom of the trio, suggested appellant go to court if he actually believed SPC CSG hired a hit man to kill his family. Appellant could have chosen to pay support, go to his command for help, not travel to SPC CSG's apartment, and not shoot her.

Second, it is not unusual that evidence is somewhat different at each trial of co-conspirators. In appellant's case, defense counsel had a strategic reason for not introducing the text messages between appellant and his spouse. Similarly, the government focused on appellant's actions in the conspiracy and shooting instead of his spouse's role. *See Williams*, 2018 U.S. Dist. LEXIS 136034 at *79 (recognizing appropriateness for prosecutor to highlight different relevant evidence at co-conspirators' trials). Our review of both appellant's record and his wife's record reveals there is evidence supporting an assertion that appellant was the lead actor and that his wife manipulated him. *See id*. at *78 (finding that evidence can accurately and reliably support different theories without being fundamentally inconsistent).

Although the closing arguments by the same prosecutor in appellant's and his spouse's cases highlighted different evidence supporting their degrees of culpability, "this does not equate with presenting inconsistent theories in violation of petitioner's constitutional right." *Williams*, 2018 U.S. Dist. LEXIS 136034 at *79. In each case, the prosecution argued appellant and his wife conspired to murder SPC CSG and appellant was the actual shooter. The prosecution did not present fundamentally inconsistent theories. Although the prosecution emphasized different facts at each trial, the underlying facts in evidence were consistent at both trials. For example, at appellant's trial, SPC CSG testified that appellant accused her of hiring a hitman to kill him. At SGT Turner's trial, the prosecution admitted into evidence text messages between appellant and SGT Turner in which she tells appellant that SPC CSG hired a hitman to kill him. At SGT Turner's trial, the

prosecution emphasized this fact in order to show her level of culpability in manipulating appellant to kill SPC CSG. However, as appellant has demonstrated, pawns can be just as deadly as a king or queen in the hands of a chess player and equally culpable under the law.

### B. Factual Sufficiency of Obstruction of Justice Conviction

Appellant was charged with obstructing justice for "disposing" of the firearm he used to shoot SPC CSG. At trial, the government's evidence essentially boiled down to two facts: (1) appellant had the firearm when he shot SPC CSG; and (2) appellant did not have the firearm one hour later when he was apprehended and the car was searched. The government argued appellant must have disposed of the firearm in the intervening hour.

Article 66(c), UCMJ, imposes on this court the duty to affirm only those findings of guilty that we find correct in law and fact. The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [this court is] convinced of [appellant's] guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). The test for legal sufficiency is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Pabon*, 42 M.J. 404, 405 (C.A.A.F. 1995) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

In appellant's case, the government was required to prove, beyond a reasonable doubt, the following elements to support a conviction of obstruction of justice: "(1) The accused wrongfully did a certain act; (2) That he did so in the case of a certain person against whom he had reason to believe there were or would be criminal proceedings pending; (3) That the act was done with the intent to influence, impede, or otherwise obstruct the due administration of justice; and (4) The conduct was to the prejudice of good order and discipline or of a nature to bring discredit upon the armed forces." *Manual for Courts-Martial, United States* (2012 ed.) [*MCM*], pt. IV, ¶96.b.(1)-(4) (2012 ed.). Viewing the evidence in the light most favorable to the prosecution, the evidence presented at trial supports a reasonable inference that appellant hid the firearm after the shooting with the intent to influence, impede, or otherwise obstruct the due administration of justice. Therefore, we find appellant's conviction for obstruction of justice is legally sufficient. *See, e.g., United States v. Davis*, 2006 CCA LEXIS 56 (Army Ct. Crim. App. 2006).

We conclude that the evidence reasonably supports that *someone* disposed of the firearm after appellant shot SPC CSG. Indeed, before they returned to the crime scene, appellant and SGT Turner changed clothes and took other actions in order to

hide their culpability. However, based on the testimony presented at trial, we are not convinced that it necessarily was appellant who disposed of the firearm.

When appellant was arrested, his wife's involvement in the crime was not immediately apparent to law enforcement. Thus, while appellant was detained almost immediately, it appears SGT Turner had relative freedom of movement. The record is unclear whether, when, and where SGT Turner was searched. A reasonable read of the facts, and one we cannot rule out, is that after appellant was arrested, and after co-conspirator liability had terminated, it was SGT Turner who disposed of the firearm. *See Grunewald v. United States*, 353 U.S. 391, 405 (1957) (holding a conspiracy ends when the objectives thereof are accomplished). Although the record reasonably suggests appellant hid the firearm after the shooting, we find the government failed to prove beyond a reasonable doubt that that is the only reasonable explanation for why the firearm was not in the vehicle or on appellant's person. Therefore, the evidence as developed on the record in this case is factually insufficient to affirm appellant's conviction of obstruction of justice.

### C. Merger of Attempted Premeditated Murder and Maiming Specifications for Findings

Appellant asserts the military judge erred when he failed to merge the Specification of Charge II (maiming) with the Specification of Charge I (attempted premeditated murder) for findings. On appeal, the government agrees that we should dismiss the lesser offense of maiming.

At trial, *after* findings were announced, appellant moved to dismiss the maiming specification as an unreasonable multiplication of charges for findings. *See* Rule for Courts-Martial [R.C.M.] 307(c)(4). At trial after the panel's findings and prior to adjournment, appellant's defense counsel also moved to dismiss the attempted murder specification for failure to state an offense, under R.C.M. 907(2)(E). The military judge disagreed with appellant that the attempted premediated murder specification failed to state an offense and denied the motion to dismiss. The trial counsel acknowledged that the maiming and attempted premediated murder specifications were charged in the alternative and did not object to conditionally dismissing the offense of maiming for findings.

In our assessment, none of the factors announced by our superior court weigh heavily in favor of any specifications being unreasonably multiplied.[11] *See United*

---

[11] The first *Quiroz* factor is whether appellant objected at trial. *Quiroz*, 55 M.J. at 339. Given appellant's untimely, oral motion made after findings were announced, this factor is neutral, at best.

*States v. Quiroz*, 55 M.J. 334, 339 (C.A.A.F. 2011). We find there is no evidence of any prosecutorial overreaching; as appellant was already facing life without the possibility of parole for attempted premeditated murder, appellant's punitive exposure is not increased; and appellant's criminality is not exaggerated were both offenses to stand. *See, e.g., id.* Given the government's concession both at trial and on appeal, we determine that the lesser offense should be conditionally dismissed as it "should [not] be approved." UCMJ, art. 66(c).

### D. *Attempted murder - Failure to State an Offense*

Appellant asserts in his *Grostefon* matters that the military judge abused his discretion when he denied appellant's motion to dismiss the Specification of Charge I, a violation of Article 81, UCMJ, which charged appellant with attempting to kill SPC CSG, with premeditation.[12]

In particular, the specification alleged that:

Appellant, did at or near Clarksville, Tennessee, on or about 1 January 2015, attempt to kill with premeditation, SPC CSG by means of shooting her with a loaded firearm and causing grievous bodily harm.

Appellant argues that the specification does not allege that the premeditated killing was unlawful. *See* Article 118(b)(1)(c), UCMJ; MCM (2012 ed.), pt. IV, ¶43.b. Appellant contends that servicemembers in the armed forces lawfully commit premeditated killings of enemy combatants on the battlefield. As such, a killing must be unlawful in order for it to be an offense under the UCMJ. *See generally United States v. Calley*, 22 U.S.C.M.A. 534, 540-41 (1973).

The CAAF has held that specifications should be viewed with maximum liberality when an accused pleads not guilty to the offense and only challenges the specification for the first time on appeal. *See United States v. Ballan*, 71 M.J. 28, 33 (C.A.A.F. 2012); *United States v. Watkins*, 21 M.J. 21, 24-26 (C.M.A. 1986). However, if an appellant challenges the specification at trial, then the specification should be reviewed more narrowly on appeal. *See United States v. Fosler*, 70 M.J. 225, 231-32 (C.A.A.F. 2011). In this case, defense counsel strategically objected prior to adjournment. As a result, appellant argues the specification should be read narrowly because defense preserved the issue by objecting after findings and prior to adjournment. *See* R.C.M. 907(b)(1)(B).

---

[12] This court specified the issue and requested additional briefings from both parties on 22 October 2018.

If appellant raised the issue for the first time on appeal, under a plain error analysis we would have easily dispensed with the issue since the specification was sufficiently specific to apprise appellant of what appellant needed to defend against and prepare for trial. Appellant cannot reasonably argue that he was surprised when the military judge instructed the panel that he was charged with attempting an *unlawful* killing when he shot SPC CSG three times. Appellant was not misled or prejudiced in defending against the specification.

The record demonstrates appellant was on sufficient notice of the offense of attempted premeditated murder. *See United States v. Crafter*, 64 M.J. 209, 211-12 (C.A.A.F. 2006). The military judge's ruling highlighted several instances during the court-martial proceedings that demonstrated appellant was on sufficient notice.

First, as the military judge noted in denying appellant's motion to dismiss, several pre-trial documents, such as the pre-trial confinement documents, Article 32(b), UCMJ, report, and appellant's pre-trial motions stated appellant was charged with attempted premeditated murder. Notably, in appellant's pre-trial request for a crime scene reconstruction and ballistics expert, appellant stated, "The Accused is presently charged with *attempted premeditated murder* in violation of Article 80, UCMJ." (emphasis added). Looking elsewhere on the charge sheet, appellant was charged, in the Specification of Charge III, with conspiring with his wife to "*murder*" SPC CSG on the same date, at the same location, and detailed the same overt act as alleged in the Specification of Charge I. Defense never requested a bill of particulars. Additionally, the first proposed voir dire question submitted to the court by defense began, "One of the offenses alleged in this case is attempted premeditated murder."

Second, appellant's entire theory of the case was premised on the idea that he was defending himself against a charge of attempted murder. Through witness testimony and in argument, appellant raised the issue of self-defense, demonstrating he was aware the government had to prove the killing was without justification or excuse. Appellant presented this theory through expert witness testimony of a crime scene and blood spatter expert. Appellant argued this affirmative defense in closing argument to the panel.

Third, the panel was instructed, without defense objection, on the elements of the offense of attempted premeditated murder, including the requirement that the killing "was done with specific intent to kill [SPC CSG]; that is, to kill without justification or excuse." *See, e.g., Crafter*, 64 M.J. at 212. Appellant was provided an opportunity to review these instructions prior to the military judge instructing the panel. Appellant did not object to these instructions and claim that the panel was being instructed on an uncharged offense.

Finally, appellant did not present any evidence at trial, or on appeal, that he was hampered in any way in his preparation for trial. *See United States v. Russell*, 47 M.J. 412 (C.A.A.F. 1998). In *Russell*, the CAAF considered that, "at trial appellant's counsel conceded that he had not been hampered in his preparation for trial by the perceived deficiency in the specifications. Thus, only legal, not actual, knowledge is at issue here." *Id*. at 413.

Since the appellant objected to the specification at trial, we review more narrowly the question of whether an attempted premeditated killing states an offense under the UCMJ. "Whether a specification is defective and the remedy for such error are questions of law, which we review de novo." *United States v. Norwood*, 71 M.J. 204, 206 (C.A.A.F. 2012), citing *United States v. Ballan*, 71 M.J. 28, 33 (C.A.A.F. 2012). A charge and specification "[are] sufficient if [they], first, contain[] the elements of the offense charged and fairly inform[] a defendant of the charge against which he must defend, and, second, enable[] him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). "A specification is sufficient if it alleges every element of the charged offense expressly or by necessary implication." R.C.M. 307(c)(3).

In this case, where appellant was charged with an "attempt," we disagree with appellant and find the Specification of Charge I alleges words of criminality sufficient to inform appellant that he was charged with the offense of attempted premeditated murder. *See* R.C.M. 307(c)(3) discussion. *See also United States v. Bryant*, 28 M.J. 504, 505 (A.C.M.R. 1989), *aff'd*, 30 M.J. 72, 73 (C.M.A. 1990) (failure to allege that conspiracy to distribute drugs was "wrongful" did not make the specification fatally defective). The Supreme Court and the CAAF have held that when an accused is charged with an attempt, "the government need only allege the elements of the inchoate offense." *United States v. Norwood*, 71 M.J. 204, 205 (C.A.A.F. 2012); *see also Wong Tai v. United States*, 273 U.S. 77, 81 (1927). For inchoate offenses, it is not essential to the validity of the charge that the offense be charged with technical precision. *See Bryant*, 30 M.J. at 74. "Practical rather than technical consideration govern the validity of the charge." *Id*. (internal quotations and citations omitted).

The elements of attempted murder are: (1) the appellant did an overt act; (2) the act was done with the specific intent to commit an offense under the code; (3) the act was more than mere preparation; and (4) the act apparently tended to effect the commission of the intended offense. *MCM*, Part IV, ¶ 4b. In appellant's case, the Specification of Charge I informed appellant that he was accused of attempting to kill with premeditation SPC CSG, at or near Clarksville, Tennessee, on or about 1 January 2015, by means of shooting her with a loaded firearm, causing grievous bodily harm. The specification is sufficient since it alleged every element of the charged offense expressly or by necessary implication. The inclusion of

"premediated killing" establishes that appellant was defending against an intentional criminal act. Not since the Civil War has Clarksville, Tennessee been close to a combat zone where appellant might claim that an attempted premeditated killing of a fellow American soldier could have been lawful.

Appellant was not charged with attempting to kill an enemy combatant. Here, the specification charged appellant with the attempted killing of a fellow soldier, "Specialist [CSG]." Either explicitly or by necessary implication, appellant was on notice SPC CSG was not an enemy combatant, but rather another soldier serving in the United States Army, and the mother of appellant's eight-month-old child. Based on the status of the shooting victim and location, appellant could not have been acting in furtherance of a military mission. We are satisfied that the language in the Specification of Charge I constitute words of criminality sufficient to apprise appellant that his actions were unlawful and that he needed to defend against the offense of attempted premeditated murder.[13]

We note, as the CAAF held in *Bryant*, "[t]he proper conclusion in this case is that, although [the Specification of Charge I] [was] challenged at trial, thus requiring that the pleadings be examined with greater scrutiny on appeal, the result is still that the pleadings adequately informed appellant of the offense against which he had to defend." *Bryant*, 30 M.J. at 75.

Accordingly, considering all of the aforementioned factors and considering the issue de novo, we find no error in the military judge's denial of the defense motion to dismiss for failure to state an offense. The charge included the specific intent, the specific overt acts, specific location, specific date, specific identity and status of the shooting victim as a fellow American soldier, and specific means for committing the offense of attempted premeditated killing. We find the Specification of Charge I adequately protects appellant from any future prosecution for the same conduct. *See Russell*, 47 M.J. at 414.

---

[13] Although we find the Specification of Charge I states an inchoate *attempt* offense with sufficient specificity, we remind trial counsel of the appellate risks of deviating from the model specifications and not including words of criminality. In drafting specifications for inchoate offenses, depending on the particular facts and offense, it is normally preferable to charge the predicate offense under the UCMJ. If trial counsel decide not to charge the predicate offense, the specification should allege words of criminality. Counsel would be hard pressed to find appellate cases critical of including words of criminality such as "wrongfully," "without authority," or "unlawfully" in a specification. On the other hand, there are many appellate cases focused on the legal consequences for excluding words of criminality from a charge.

## CONCLUSION

Upon consideration of the entire record, Specification 1 of Charge IV is SET ASIDE and DISMISSED. The Specification of Charge II is *conditionally* SET ASIDE and *conditionally* DISMISSED. Our dismissal is conditioned on the finding of guilty to the Specification of Charge I surviving further appeal, if any to our superior court. *See United States v. Britton*, 47 M.J. 195, 203 (C.A.A.F. 1997) (Effron, J., concurring); *United States v. Hines*, 75 M.J. 734, 738 n. 4 (Army Ct. Crim. App. 2016); *United States v. Woods*, 21 M.J. 856, 876 (A.C.M.R. 1986). The remaining findings of guilty are AFFIRMED.

We reassess the sentence in accordance with the principles of *United States v. Winckelmann*, 73 M.J. 11 (C.A.A.F. 2013) and *United States v. Sales*, 22 M.J. 305, 307-08 (C.M.A. 1986).[14] We are confident the panel would have adjudged a sentence at least as severe as the approved sentence absent appellant's conviction for obstruction of justice. While the conviction of Specification 1 of Charge IV increased appellant's maximum punishment that may be imposed by five years of confinement, it is overshadowed by the maximum punishment of life without eligibility for parole for each of appellant's convictions for attempted premeditated murder and conspiracy to commit murder.

The gravamen of appellant's crimes was the attempted premeditated murder and conspiracy to commit murder, not the obstruction of justice. The facts of this case are particularly egregious considering the extent of SPC CSG's injuries when appellant shot SPC CSG three times, at close range, in front of his eight-month old son. Appellant was sentenced to a dishonorable discharge, confinement for life without the eligibility for parole, forfeiture of all pay and allowances, and reduction to the grade of E-1. In light of the sentence received and the gravamen of the remaining offenses of which appellant was convicted, we AFFIRM the approved sentence. All rights, privileges, and property of which appellant has been deprived by virtue of that portion of the findings set aside by this decision, are ordered to be restored. *See* UCMJ, art. 58b(c) and 75(a).

---

[14] Since the military judge merged the attempted premediated murder and maiming specifications for sentencing, we do not separately reassess the sentence based on our *conditionally* setting aside and *conditionally* dismissing The Specification of Charge II.

Chief Judge BERGER and Judge SCHASBERGER concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court